NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 10a0578n.06

Case No. 08-5913/5929

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
**Aug 31, 2010**
LEONARD GREEN, Clerk

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff-Appellee, | ) |
| | ) ON APPEAL FROM THE |
| v. | ) UNITED STATES DISTRICT |
| | ) COURT FOR THE EASTERN |
| JOSHUA SMITH and MICHAEL V. | ) DISTRICT OF TENNESSEE |
| SMITH, | ) |
| | ) |
| Defendants-Appellants. | ) |
| | ) |
| _____ | ) |
| | ) |

BEFORE:  BATCHELDER, Chief Judge; MOORE and COOK, Circuit Judges.

ALICE M. BATCHELDER, Chief Judge.  Joshua Smith ("Joshua") and Michael Smith ("Michael") were convicted of various federal offenses for their part in a multi-defendant drug conspiracy in Tennessee and now appeal their convictions and sentences.  For the reasons that follow, we affirm the district court's rulings and defendants' convictions and sentences.

## BACKGROUND

### I.    THE CONSPIRACY

The conspiracy began in early 2006 with an agreement between Brian Maldonado ("Maldonado") and Brian Matheny ("Matheny").  Maldonado provided the conspiracy with drugs through his Atlanta-based supplier, Kirk Spence, also known as "Cato."  Once the drugs were obtained from Cato, they were divided equally between Joshua and Matheny who, in turn, distributed the drugs to a number of underlings.  Joshua had at least five distributors who reported to him:  four

individuals known only by their first names—A.G., Shaky, Craig, and Jessie; and his girlfriend, Natasha Thompson ("Thompson").

In January 2006, Joshua and Matheny made their first trips to Atlanta to obtain drugs from Cato. On each of three trips, they purchased both cocaine and marijuana. After those first three trips, and beginning in February 2006, Matheny began making the trips to Atlanta by himself, but the drugs were still split between Matheny and Joshua upon Matheny's return. On at least one occasion, the drugs were temporarily stored at Joshua's house because Matheny considered it a safe location. By April or May, the conspiracy was successful enough that Matheny began making multiple trips to Atlanta every week, sometimes as many as four trips. Each trip typically yielded one kilo of cocaine and approximately 40-50 pounds of marijuana, and those amounts were split evenly between Josh and Matheny.[1]

Michael entered the conspiracy in March, 2006, when he became one of Matheny's distributors. Initially, he received 10-15 pounds of marijuana at a time and, at some point in March or April, 2006, he also began receiving small mounts of cocaine each week. His weekly allotment of marijuana increased to twenty pounds of marijuana during the same time period. The marijuana was "fronted" to Michael, allowing Michael to receive the drugs without paying, so long as Michael returned with the money once it was sold. Michael remained a distributor for Matheny until January 25, 2007, when Matheny was arrested.

---

[1]Matheny testified that, at some point, he started giving "a little bit of the quantities" to a group of the codefendants, as well, but does not specify further how much he gave them.

2

## II.    THE INVESTIGATION

The government had investigated the conspiracy almost from its inception. On January 21, 2006, Jeff Cessna ("Cessna"), an undercover law enforcement officer, purchased marijuana from Robert Robinson ("Robinson"), who received it from Joshua. On January 30, 2006, Cessna and Robinson met with Joshua, who Robinson said was his "man." During the January 30 meeting, Joshua sold one ounce of cocaine to Robinson, who then sold it to Cessna. On February 16, 2004, Cessna requested cocaine from Thompson, who indicated that she would have to wait for Joshua to bring the cocaine before the sale could be completed. Once Joshua arrived, the sale occurred. On February 24, 2006, Cessna requested two ounces of cocaine from Thompson, and Joshua again delivered the cocaine in person. Cessna purchased cocaine from Joshua, using Thompson as an intermediary, a number of additional times, including one purchase of five ounces. In March or April 2006, Cessna and Joshua got into an argument, and Joshua told Cessna never to contact him again. Other efforts at investigation were attempted, but without much success.

## III.    THE WIRETAP

On November 7, 2006, Special Agent Mike Burnette ("Burnette"), of the Tennessee Bureau of Investigation, and Assistant District Attorney Joshua Parsons ("Parsons"), requested and obtained an order from state Judge Leon Burns, authorizing the use of wiretaps to intercept Joshua's phone calls. As part of that order, a member of the investigative team was "required to appear and report, *ex parte*, to [Judge Burns] every ten (10) days . . . on the progress towards the achievement of the authorized objectives and the need for continued interception." The order was reauthorized on December 11, 2006. On December 6, 2006, as a result of information obtained from the wiretaps

of Joshua's phone, the government obtained an order from Judge Burns to intercept the phone calls of Maldanado and Matheny.[2] On January 4, 2007, Judge Burns signed an order allowing the government to intercept the phone calls of Cato. These subsequent orders also included the requirement that a member of the government's investigative team appear and report to Judge Burns.

It is undisputed that written reports were submitted, as required, every ten days.[3] The reports were hand-delivered to Judge Burns' office by either Burnette or Parsons. Each time Burnette delivered a report, he also met face-to-face with Judge Burns and discussed the progress of the wiretaps. Parsons, on the other hand, could not recall whether he spoke with Judge Burns each time he delivered a report. He testified, however, that he spoke with Judge Burns at least once every six or seven days, keeping Judge Burns apprised of the progress of the wiretaps. At no time did Judge Burns complain about the form in which the reports were presented, and he authorized additional wiretaps and reauthorized the initial wiretap after a number of reports had been presented.

## IV. TRIAL

The wiretapped conversations proved very useful to the prosecution during trial. Michael's identity was revealed in his communications with Matheny and in communications between Matheny and Maldonado. Various drug deals were discussed on the wiretaps. Michael was recorded complaining about his apparent inability to receive product and declared that he had sold "one half million dollars" for the conspiracy during the previous year; the product at issue sold at a price of $625 per pound during the relevant time period. Maldonado complained repeatedly that Matheny

---

[2]The wiretaps on Maldonado and Matheny were reauthorized by Judge Burns on January 6, 2007.

[3]The final report submitted was, apparently, not signed as required, but it was submitted after the wiretap had ceased.

owed him money, Matheny complained that Michael owed him money, and Joshua stated that he owed Maldonado and Matheny money, all related to drug transactions. Joshua volunteered to take action against another drug dealer who might have been attempting to sell drugs in their territory.

Evidence at trial indicated that some of these cell-phone calls were relayed through cell towers in the Eastern District of Tennessee, and Burnette testified that cell phones utilize the closest cell tower.

Utilizing the evidence contained in the intercepted communications, law enforcement obtained a search warrant for Joshua's residence. When officers executed the search warrant, they found marijuana, drug ledgers, and digital scales with marijuana residue. During the initial entry into the residence to execute the search warrant, Joshua briefly pointed a gun at one of the officers.

Prior to trial, the defendants moved to suppress the wiretap communications arguing, among other things, that the police had failed to abide by the wiretap orders' requirement that the 10-day reports be presented in person. The district court denied the motion to suppress and the case went to trial. At trial, the government called Matheny as a witness to interpret the meaning of the phone calls for the jury. Joshua was convicted of conspiracy to distribute more than 5 kilograms of cocaine and 100 kilograms of marijuana, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A) and (B), and 846, and two counts of using a communication facility to commit a drug offense, in violation of 21 U.S.C. §§ 843(b) and 846. Michael was convicted of conspiracy to distribute less than one-half kilogram of cocaine and more than 100 kilograms of marijuana, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B). The case then proceeded to sentencing.

## V.    SENTENCING

The presentence report for Joshua established a base offense level of 34.  Joshua was assessed a two point enhancement under U.S.S.G. § 3B1.1 for having a leadership role in the conspiracy and a two point enhancement under § 2D1.1(b)(1) for possession of a firearm.  Joshua was also determined to be a career offender, predicated on a prior drug conviction and a prior conviction for attempted kidnaping.  The presentence report relates the following regarding the circumstances of the attempted kidnaping:

> On December 18, 2000, Joshua Smith went to the home of Carlo Spaccarotelli and attempted to force him into a motor vehicle at gun point while being assisted by four other individuals.  The defendant's actions resulted in Mr. Spaccarotelli being shot. Joshua Smith was originally arrested for Attempted Especially Aggravating Kidnaping and Attempted 1st Degree Murder.  He was later indicted with four other individuals for Attempted 1st Degree Murder and Attempted Aggravated Kidnaping. He was allowed to plead to a reduced charge at sentencing and the Attempted First Degree Murder charge was nolled.

Joshua's final offense level was 38, with a criminal history category of VI, leading to a guidelines range of 360 months to life.  After consideration of all relevant criteria, the district court sentenced Joshua to 380 months.

The presentence report for Michael established a base offense level of 26.  Michael was assessed a 2-point enhancement for obstruction of justice, due to his repeated false testimony during trial.  Michael had one previous drug conviction, along with a host of minor convictions, but was determined to have a criminal history of only I.  His guidelines range was 78 to 97 months, but his conviction was subject to a statutory minimum of 120 months, and the district court imposed the statutory minimum.  Michael objected to the 2-point enhancement for obstruction of justice, but the district court determined that there was sufficient evidence that Michael had perjured himself at trial.

The district court also noted that the mandatory minimum was greater than the guideline range regardless of the enhancement and was, therefore, controlling.

## VI. NEW AFFIDAVITS

After sentencing, the government revealed that it was in possession of an affidavit from Matheny that contained statements that contradicted the testimony that Matheny had offered at the separate trial of other co-conspirators. Specifically, Matheny stated that the quantity of drugs sold to one John Paul Hassler was less than the amount Matheny testified to at Mr. Hassler's trial. This affidavit had been received by the government after Michael and Joshua had been convicted but before their sentencing. A similar affidavit has since been submitted to the court by counsel for Michael, wherein Matheny states that the amounts of drugs he sold to one Richard Kontour was less than the amount Matheny testified to at Mr. Kontour's trial. Michael also claims that Matheny was incarcerated with him for a time, and that Matheny recanted his entire trial testimony to Michael, as well as to other co-defendants. No independent evidence corroborates this allegation.[4] Michael moved for a new trial based on the first affidavit, but that motion was denied by the district court.

Joshua and Michael filed timely appeals of their convictions and sentences. They both argue that the district court erred in not suppressing the wiretap communications, and that there was insufficient evidence to support their convictions. Joshua separately appeals the two point enhancements for leadership and possession of a firearm and his designation as a career criminal. Michael appeals the two point enhancement for obstruction of justice and the denial of his motion for a new trial.

---

[4]The only support for these last claims are letters from Michael to his attorney, relating the alleged communications between Matheny and Michael and Matheny and other co-defendants.

**ANALYSIS**

### I.     MOTION TO SUPPRESS

"On appeal from the denial of a motion to suppress, this court reviews the district court's findings of fact for clear error and its conclusions of law de novo." *United States v. Smith*, 594 F.3d 530, 535 (6th Cir. 2010). All evidence is to be considered in the light most favorable to the government, as the prevailing party below. *Id.* "In reviewing the validity of an electronic surveillance order, we will accord 'great deference' to the determinations of the issuing judge." *United States v. Corrado*, 227 F.3d 528, 539 (6th Cir. 2000).

In this case, defendants do not appeal the orders authorizing the wiretaps, but instead argue that the government violated the express terms of the orders when they failed to present oral reports to the issuing judge at the time that the written reports were submitted. We disagree.

Judge Burns, in issuing his orders authorizing the use of wiretaps, required Parsons, Burnette, or some other member of their investigative team to "appear and report" every ten days. Under Tennessee law, an authorization order for a wiretap "shall require that reports be made to the judge who issued the order showing what progress has been made toward achievement of the authorized objective and the need for continued interception. Reports shall be made at ten-day intervals . . . ." Tenn. Code Ann. § 40-6-308(c) (2006).[5] Defendants' arguments rest upon the alleged requirement that the reports to Judge Burns be made orally, in person, yet such a requirement is neither statutory nor clearly included in the language of Judge Burns' order.

---

[5] Under federal law, an authorizing judge "*may require* reports to be made . . . showing what progress has been made toward achievement of the authorized objective and the need for continued interception. Such reports shall be made at such intervals as the judge may require." 18 U.S.C. § 2518(6) (emphasis added).

Defendants offer no factual or legal support for their argument that the "appear and report" language required an oral presentation of the report. There is no evidence that the phrase is a term of art with special meaning and it is susceptible to a number of reasonable alternative definitions. For example, the "appear and report" language may have been intended solely as a requirement that a member of the investigative team hand-deliver the report every ten days, in order to assure that Judge Burns was in possession of the report in a timely manner. While Judge Burns's precise intent may be unclear, it is perfectly clear that Judge Burns, himself, did not interpret the "appear and report" language to require an oral presentment of the 10-day reports. There is no evidence that he was ever displeased with submission of only written reports, on those occasions when Parsons allegedly failed to speak directly with the Judge. To the contrary, Judge Burns reauthorized the initial wiretap order for Joshua and authorized additional wiretaps against Matheny, Maldonado, and Cato. The actions of the authorizing judge provide strong evidence regarding the compliance of the investigative team with the wiretap order. *See In re DeMonte*, 674 F.2d 1169, 1174 (7th Cir. 1982) ("In the present case the reports were found to be sufficient by [the supervising] judge. Thus they satisfied the condition of the authorizing order.").

It is undisputed that Parsons and Burnette complied with the statutory requirement that reports be filed every ten days. It is also undisputed that Parsons and Burnette had regular contact with Judge Burns, reporting to him on the progress of the wiretaps no less than every six or seven days. These oral reports and the written reports fulfilled, in every meaningful way, even the defendants' questionable reading of Judge Burns's orders. Defendants, however, argue that because

the government could not prove that it had made an oral report contemporaneous to the written report, the results of the wiretap must be suppressed. That argument cannot be sustained.

Tennessee law provides three grounds upon which a defendant may move to suppress intercepted communications: (1) "the communication was unlawfully intercepted;" (2) "the order of authorization under which the evidence was intercepted is insufficient on its face;" or (3) "the interception was not made in conformity with the order of authorization." Tenn. Code Ann. § 40-6-304(h)(1) (2006). This language is virtually identical to the language of 18 U.S.C. § 2518(10), which governs suppression of wiretap communications, so under either Tennessee or federal law, suppression of intercepted communications is appropriate only if it meets one of these three elements.

Defendants argue that the Supreme Court decision in *Gelbard v. United States*, 408 U.S. 41 (1972), requires courts to construe wiretapping provisions narrowly, in order to further Congress's intent of protecting privacy. *Id.* at 48. But the Court's statements to this effect were dicta and drawn exclusively from legislative history, rather than the statutory text. Moreover, the *Gelbard* Court expressly stated that it was dealing with a "narrow question, . . . whether . . . the witnesses may invoke the prohibition of [18 U.S.C. § 2515] as a defense to contempt charges brought on the basis of their refusal to obey court orders." *Id.* at 47. A Supreme Court case more directly on point is *United States v. Chavez*, 416 U.S. 562 (1974), in which the Court declined to require suppression of intercepted communications for "every failure to comply fully with any requirement." *Id.* at 574-75. To do so, the Court reasoned, "would be at odds with the statute itself," due to the fact that the statute expressly lists those circumstances under which suppression is appropriate. *Id.* at 575.

Defendants' arguments rest entirely on a determination of whether the government's alleged failure to make an oral presentation every time a 10-day written report was submitted constituted a violation of the authorizing order. Due to the ambiguity of the "appear and report" language, the regular oral communication that occurred between the government and Judge Burns during the time period of the wiretaps and, most importantly, the fact that Judge Burns, the authorizing judge, clearly found the government's reporting efforts to be sufficient, we find that there was no violation of the authorizing order and the district court did not err in refusing to suppress the intercepted communications.

## II.     SUFFICIENCY OF EVIDENCE

"When a conviction is attacked for insufficiency of the evidence, the evidence is viewed in the light most favorable to the prosecution to determine whether any rational trier of fact could have found each essential element of the offense beyond a reasonable doubt." *United States v. Barnett*, 398 F.3d 516, 521–22 (6th Cir. 2005). We will reverse a judgment for insufficiency of the evidence only if the judgement is not supported by substantial and competent evidence upon the record as a whole. *Id.* at 522.

### A.     Michael's Conviction

Michael claims that there was insufficient evidence to support a judgment that he had distributed over 100 kilograms of marijuana. In making that argument, he relies on the fact that the total amount of marijuana discussed on the intercepted phone calls amounts to between 48 and 58 pounds, which translates to somewhere between 22 and 27 kilograms. However, Matheny testified that he sold Michael up to 30 pounds in March 2006, and then sold Michael up to 15 pounds per

11

week beginning in April 2006. Over the course of their dealings together, nearly 11 months, this would have yielded a cumulative total of over 500 pounds, or well over 200 kilograms. Moreover, in one of the intercepted communications, Michael complains that he had sold half a million dollars worth of drugs for the conspiracy during the last year and indicates that the price of the marijuana was $650 per pound. A simple calculation indicates that half a million dollars worth of marijuana, at that price, would be well over 700 pounds, or over 300 kilograms. Taken together, this evidence is substantial and competent, and sufficient to support Michael's conviction.

### B. Joshua's Conviction

#### 1. *Drug amounts*

Joshua argues that the evidence was insufficient to support his conviction for conspiracy to distribute over 100 kilograms of marijuana and 5 kilograms of cocaine, and his conviction on two counts of using a communications facility to facilitate a drug transaction. With regard to the drug convictions, there is substantial and competent evidence to support the judgment. While it is true—as Joshua emphasizes—that the search of his residence uncovered only a small amount of marijuana, there is sufficient additional evidence which supports the judgment.

Joshua provided the drugs sold to Cessna during March 2006, providing the initial basis for the wiretaps. Matheny testified that Joshua participated in purchasing drugs from Cato on those occasions where Joshua accompanied Matheny to Atlanta during March. Matheny also testified that every shipment of drugs from Atlanta was split evenly between Matheny and Joshua, and that there were at least two shipments a week, and sometimes as many as four, beginning in April or May 2006. According to Matheny, the shipments typically consisted of one kilogram of cocaine and 50

pounds of marijuana. At two trips per week, Joshua would have received, as his share of the shipments, one kilogram of cocaine and 50 pounds of marijuana per week. Over the course of the period between April 2006 and December 2007, Joshua would have received over 30 kilograms of cocaine and over 1,000 pounds of marijuana.

2.      *Existence of a Conspiracy*

There is also sufficient evidence to support the existence of a conspiracy, and Joshua's part in the conspiracy. Specifically, Matheny's testimony indicates that Joshua was a partner in the drug trade, receiving a 50% share in all drug shipments. There are also a number of recorded phone calls in which the revolving debts between Maldonado, Matheny, Joshua, and various distributors are mentioned, typically in connection with the purchase of drugs. Finally, while Joshua contends that the drug conspiracy consisted of Maldonado and Matheny, one recorded phone call indicates that Maldonado considered Joshua to be on an equal footing with Matheny, in terms of the conspiracy.

3.      *Use of a Communication Facility*

Joshua also challenges, on two separate grounds, the sufficiency of the evidence supporting his conviction on two counts of using a communication facility to facilitate a drug transaction. First, Joshua argues that the content of the phone calls indicates that no drug transactions took place, in that the phone calls were dominated by complaints that Maldonado and Joshua had neither drugs nor money. The government responds that the phone calls in question were clearly related to the drug conspiracy. Second, Joshua argues that there is no evidence that either Joshua or Maldonado was in the Eastern District of Tennessee, even though the undisputed evidence showed that the calls used a cell tower located in the Eastern District. Joshua treats the location of the individual placing the

phone call as an element of the crime, and argues that the government was required to prove the location beyond a reasonable doubt. The government responds that the location of the phone calls is an issue of venue only, not an element of the crime, and that venue was shown to be proper by a preponderance of the evidence.

Joshua's first argument fails because it is well-established that the government need not prove that a specific drug transaction resulted from a communication in order to prove that the use of a communication facility "facilitated" the transaction. *United States v. McLernon*, 746 F.2d 1098, 1106 (6th Cir. 1984). In *McLernon*, the court held that a telephone statement indicating that "all [the co-conspirators] can do is wait," when taken in context of the entire conspiracy, was sufficient to show that the phone call made fulfillment of the conspiracy's goals easier. *Id.* Other Circuits have reached the same conclusion. *See United Stats v. Dixon*, 132 F.3d 192, 200 (5th Cir. 1997) ("[T]he government only is required to establish that [the defendant] used the telephone to facilitate an attempt to distribute drugs."); *United States v. Milton*, 62 F.3d 1292, 1294 (10th Cir. 1995) ("[T]o sustain a facilitation conviction under [21 U.S.C.] § 843(b), it was not necessary to prove an actual distribution, at least where the defendant was also convicted of conspiracy."). Joshua's communications with Maldonado were clearly connected to the drug conspiracy and, as such, facilitated the conspiracy. *See United States v. Slayton*, 366 F. App'x 650, 655-56 (6th Cir. 2010).

Joshua's second argument fails because the location of the alleged violation of § 843(b) is a question of venue, not an element of the crime. As such, it need only be proved by a preponderance of the evidence. *United States v. Crozier*, 259 F.3d 503, 519 (6th Cir. 2001). Joshua argues that he and Maldonado both live in the Middle District of Tennessee, but when the defendant

is charged with conspiracy, venue is proper in any district where an overt act in furtherance of the conspiracy was performed. *Id.* At trial, Burnette testified that the phone calls between Joshua and Maldonado utilized a cell tower in the Eastern District of Tennessee, and testified that cell phones will utilize the nearest cell tower. Joshua complains that the government failed to call an expert witness to offer this testimony, but there is no indication he ever objected to the introduction of the evidence through Burnette, rather than by calling an expert witness, so this objection is waived. *See Bowman v. Corr. Corp. of Am.*, 350 F.3d 537, 548 (6th Cir. 2003). Viewing the evidence in the light most favorable to the government, a rational trier of fact could easily have concluded that the phone calls facilitated the conspiracy and that venue was proper.

This evidence is substantial and competent, and is sufficient to support Joshua's conviction.

## III.    NEWLY DISCOVERED EVIDENCE

We review a denial of a new trial based on newly discovered evidence under an abuse of discretion standard. *United States v. Dailide*, 316 F.3d 611, 620 (6th Cir. 2003). The general test for granting a new trial requires the party seeking a new trial to show that:  (1) the evidence was discovered after trial; (2) the evidence was not discoverable earlier through due diligence; (3) the evidence is of the nature that might have led to a different result; and (4) the evidence is material, not merely cumulative or impeaching. *United States v. O'Dell*, 805 F.2d 637, 640 (6th Cir. 1986). We have also stated that:

> A new trial should be granted where the court is reasonably well satisfied that the testimony given by a material witness is false; that, without it, the jury might have reached a different conclusion; that the party seeking the new trial was taken by surprise when the false testimony was given and was unable to meet it or did not know of its falsity until after the trial.

15

*Gordon v. United States*, 178 F.2d 896, 900 (6th Cir. 1949) (citing *Larrison v. United States*, 24 F.2d 82, 88 (7th Cir. 1928)). It is clear that the district court did not abuse its discretion in denying a new trial based on the Matheny affidavits.

Michael argues that the affidavits of Matheny, submitted after trial, are grounds for a new trial, and that the district court erred in refusing to grant a new trial or even an evidentiary hearing on the matter. None of the alleged evidence, however, is sufficient to warrant a new trial under either *O'Dell* or *Gordon*. It is clear that the affidavits were discovered after trial, but the remaining elements either do not strongly favor either side or else they argue strongly against a new trial.

It is not known the exact circumstances under which the Matheny affidavits were procured and, therefore, it is not clear that they could not have been obtained prior to the close of trial through an exercise of due diligence. Michael argues that Matheny has said that he felt pressured to exaggerate the amount of drugs in order to obtain a downward departure, yet this bit of hearsay is not corroborated by any substantive evidence. Moreover, the Matheny affidavits, themselves, allege only that Matheny offered false testimony during the separate trials of other co-conspirators, not during Michael's trial. There is, therefore, no admissible evidence to support a conclusion that Matheny's testimony during Michael's trial was false. More importantly, the affidavits are not material to Michael's conviction, because neither affidavit implicates Matheny's testimony regarding his interaction with Michael, and neither disavows the existence and purpose of the conspiracy with regard to the two other individuals. In the affidavits, Matheny does not dispute that he sold drugs to the individuals listed in the affidavits, but merely disputes the total amounts sold. Even

16

Matheny's alleged confession to Michael pertains only to amounts, not to the existence or operation of the drug conspiracy.

The only useful purpose of the affidavits would be to impeach Matheny's testimony, a fact effectively conceded by Michael in arguing that the affidavits show "a complete lack of credibility as to Mr. Matheny" and that "Mr. Matheny [is] totally corrupt . . . call[ing] into question the objectiveness and fairness of the whole trial." Unfortunately for Michael, we have expressly held that a new trial may not be granted if the newly discovered evidence is merely impeaching. *O'Dell*, 805 F.2d at 640. We therefore affirm the district court's denial of Michael's motion for new trial.

## IV. SENTENCING

Both defendants argue that the district court improperly imposed sentencing enhancements. Michael claims that a two-level enhancement for obstruction of justice, pursuant to U.S.S.G. § 3C1.1, was incorrect. Joshua challenges: (1) the two-level enhancement for possession of a firearm pursuant to U.S.S.G. § 2D1.1(b)(1); (2) the two-level enhancement for leadership in the conspiracy pursuant to U.S.S.G. § 3B1.1(c); and (3) his designation as a career criminal.

### A. Michael's Sentencing

When sentencing Michael, the district court imposed a two level enhancement, pursuant to § 3C1.1 because it found that there was sufficient evidence to conclude that Michael had repeatedly perjured himself during trial. Michael does not challenge the right of the district court to impose an enhancement for obstruction of justice in the case of perjury, but merely argues that the facts do not support a finding of perjury. As the district court noted, however, the crime for which Michael was convicted carried a statutory minimum sentence that was greater than the upper limit of the

guidelines range even with the enhancement included. Therefore, even if the district court erred in imposing the enhancement, it was harmless error and we need not consider Michael's arguments regarding the enhancement.

Even if we were to consider the merits of Michael's arguments, however, we would still uphold his sentence because it is clear that the district court did not err in imposing the sentencing enhancement. We review the district court's factual findings relating to the application of § 3C1.1 for clear error. *United States v. Zajac*, 62 F.3d 145, 148 (6th Cir. 1995). The district court concluded that Michael had perjured himself by testifying that he had been involved selling drugs for only a couple of months, rather than approximately a year; by testifying that he had only dealt with an individual named Hoss Crawford, rather than the remaining members of the conspiracy; by testifying that a scale seized at his residence was used only for weighing tomatoes, rather than drugs; and by testifying that the seven pounds of marijuana seized at his residence was only for his personal use, as he had sufficient supply for 56 months of typical use by a single user. There is sufficient evidence to support the district court's conclusions regarding Michael's false testimony, and its decision to impose the obstruction of justice enhancement was not clearly erroneous.

**B.     Joshua's Sentencing**

*1.     Career Criminal Designation*

Joshua raises an objection to his designation as a career criminal, pursuant to U.S.S.G. § 4B1.1, which was based on two prior convictions. Joshua concedes that the first conviction, a felony drug charge, qualifies under § 4B1.1, but he appeals the district court's holding that the second conviction, for attempted kidnapping, is a "crime of violence" under § 4B1.1.

We review de novo a district court's determination that an offense is a crime of violence, as defined in U.S.S.G. § 4B1.2. *United States v. Arnold*, 58 F.3d 1117, 1120 (6th Cir. 1995). This Court first must determine whether the prior conviction "is for a crime that is among those specifically enumerated in the guidelines." *United States v. Wood*, 209 F.3d 847, 850 (6th Cir. 2000). Section 4B1.2 defines a crime of violence as:

> any offense under federal or state law, punishable by imprisonment for a term exceeding one year, that (1) has as an element the use, attempted use, or threatened use of physical force against the person of another, or (2) is burglary of a dwelling, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another.

U.S.S.G. § 4B1.2(a). If an offense is specifically enumerated, then "it is a crime of violence for sentencing purposes," and the court need not analyze whether it qualifies under the other criteria. *Id.* The application notes to § 4B1.2 make clear that kidnaping is a crime of violence, a point that Joshua concedes. However, Joshua argues that attempted kidnaping is not listed and that the omission is an indication that attempted kidnapping should not be considered a crime of violence. This argument is without merit, for the application notes also expressly indicate that "'Crime of violence' . . . include[s] the offenses of aiding and abetting, conspiring, and *attempting to commit* such offenses." *Id.*, comment. (n. 1) (emphasis added).

Because attempted kidnaping is an enumerated crime of violence, the district court did not err in designating Joshua as a career criminal.

*2.      Leadership Enhancement*

Joshua also challenges the imposition of a two-level leadership enhancement, pursuant to U.S.S.G. § 3B1.1. This Circuit has not established the standard of review for sentencing

19

enhancements under § 3B1.1. *United States v. Moncivais*, 492 F.3d 652, 660 (6th Cir. 2007) (explaining why the state of the law is unresolved). We need not make such a determination in this case either, because we would uphold the district court's imposition of the leadership enhancement under either clear error or de novo review.

The evidence shows that Joshua was a second-tier leader of the conspiracy, answering only to Maldonado and distributing cocaine and marijuana to at least five distributors and his girlfriend. Thompson and Robinson, two of Joshua's distributors, purchased drugs from Joshua and sold the drugs to Cessna. Thompson had to phone Joshua and wait for him to arrive with the drugs before she could complete a number of the transactions. The evidence also shows that Joshua had four other distributors, A.G., Shaky, Craig, and Jessie. We have upheld a role enhancement under § 3B1.1(b) when the defendant directed the actions of only one individual. *See United States v. Solorio*, 337 F.3d 580, 600–01 (6th Cir. 2003). The evidence here indicates that Joshua directed the activity of no less than six other individuals in furtherance of the conspiracy, including requiring direct involvement by Joshua before certain transactions could take place. The district court correctly imposed a leadership enhancement on Joshua.

3. *Use of a Firearm*

Finally, Joshua argues that the imposition of a two-level enhancement for use of a firearm during a drug crime was improper. We will uphold a finding by the district court that a defendant possessed a firearm during a drug crime unless it is clearly erroneous. *Id.* at 599. The government must first show that the defendant possessed the firearm, but Joshua concedes that he pointed a firearm at a police officer during the execution of a search warrant on his residence. The burden,

20

therefore, falls on Joshua "to demonstrate that it was clearly improbable that the weapon was connected to the offense." *Id.*

Instead of attempting to meet his burden, Joshua attempts to change the subject, first by arguing that the sentencing enhancement is improper because he was not charged with a firearms offense and, second, because the alleged possession took place in the Middle District of Tennessee, not in the Eastern District, where the trial was held. These facts are irrelevant to our review of the district court's imposition of a two-level firearms enhancement. Notably, Joshua offers no legal support for his arguments and, in fact, cites no case law at all, and the government expresses frustration in not being able to find case law directly on point. The lack of relevant case law is not surprising considering the complete lack of legal merit to Joshua's claims.

The Seventh Circuit appears to have come closest to this issue in *United States v. Dawn*, 129 F.3d 878 (7th Cir. 1997). In *Dawn*, the defendant was charged with production of child pornography. He objected to certain findings, made at sentencing, regarding films which he produced outside of the geographical boundaries of the United States. He claimed that, because the activities occurred on foreign soil, they should not have been considered by the sentencing court. The Seventh Circuit disagreed, stating that:

> [n]one of the guidelines . . . makes the relevance of the defendant's conduct turn on whether that conduct took place within or without the borders of the United States . . . [but] focus instead upon the factual and logical relationship between the offense of conviction and the defendant's other acts, wherever they may have occurred.

*Id.* at 882. Similarly, U.S.S.G. § 2D1.1 does not make the relevance of Joshua's conduct turn on where possession of the firearm took place, so imposition of the firearms enhancement was proper.

21

## CONCLUSION

For the foregoing reasons, we **AFFIRM** the judgment of the district court.

**KAREN NELSON MOORE, Circuit Judge, concurring only in the judgment.** I concur in the judgment affirming the judgment of the district court.

With respect to Michael Smith's challenge to the sufficiency of the evidence, I would uphold his conviction for conspiracy to distribute over 100 kilograms of marijuana based on the evidence presented to and accepted by the jury. As we have observed previously, "[t]he relevant question in assessing a challenge to the sufficiency of the evidence is whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. McAuliffe*, 490 F.3d 526, 537 (6th Cir.), *cert. denied*, 552 U.S. 976 (2007). Michael cannot challenge the sufficiency of the evidence merely by contradicting the amounts presented at trial through Matheny and the taped conversations. *See United States v. Gardner*, 488 F.3d 700, 710 (6th Cir. 2007) ("[T]his court does not weigh the evidence, consider the credibility of witnesses, or substitute its judgment for that of the jury." (internal quotation marks omitted)); *United States v. Paige*, 470 F.3d 603, 608 (6th Cir. 2006) ("[A]ttacks on witness credibility are simple challenges to the quality of the government's evidence and not the sufficiency of the evidence." (internal quotation marks omitted)); *see also United States v. Deitz*, 577 F.3d 672, 681 (6th Cir. 2009) ("[O]n appeal, there is no place for arguments regarding a government witness's lack of credibility." (internal quotation marks and alterations omitted)), *cert. denied*, 130 S. Ct. 1720 (2010).

Sufficient evidence supports Joshua Smith's convictions for violating 21 U.S.C. § 843(b), knowingly and intentionally using a communication facility to facilitate the conspiracy to distribute controlled substances. Viewed in the context of the entire conspiracy and in the light most favorable to the government, the two phone calls referenced in the indictment present sufficient circumstantial

23

evidence of the ongoing relationship between Joshua and Maldonado from which a reasonable jury could conclude that Joshua violated § 843(b)—he knowingly used his cellular phone to call Maldonado to inquire about incoming drug shipments that he needed to distribute to his customers and to discuss the money that he owed to Maldonado for outstanding shipments and that others owed to him. The Supreme Court has recently narrowed the definition of "facilitate" in § 843(b). *Abuelhawa v. United States*, 129 S. Ct. 2102 (2009). As we recently explained,

> In defining "facilitate," the Supreme Court recently stated that Congress had something in mind akin to aiding, abetting, or assisting when it used the term. *Abuelhawa v. United States*, 129 S. Ct. 2102, 2106 (2009). Thus, according to *Abuelhawa*, a buyer's use of a telephone to arrange the purchase of small quantities of drugs for personal use does not constitute "facilitating the commission" of a drug-related felony for the purpose of § 843(b). *Id.* at 2107.

*United States v. Slayton*, 366 F. App'x 650, 655–56 (6th Cir. 2010). In *Abuelhawa*, the Court explicitly disagreed with the "literal" meaning of "facilitate" because it concluded that utilizing a broader definition would increase the penalties for a larger class of drug crimes than Congress intended. *Abuelhawa*, 129 S. Ct. at 2105 (rejecting lower court's expansive definition of "facilitating" that would include a buyer's use of a telephone to make two small purchases of drugs on basis that "they 'undoubtedly made . . . distribution easier'"). Joshua's phone calls here were more than merely "connected to the drug conspiracy" and did more than just "ma[k]e fulfillment of the conspiracy's goals easier." His phone calls satisfied the *Abuelhawa* definition of "facilitating."

Because I would affirm the district court's judgment, I concur in the judgment.