RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 12a0297p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

—————————————

UNITED STATES OF AMERICA,
            *Plaintiff-Appellee*,

            *v.*                                        No. 11-3143

JOHN E. GRAY,

            *Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Ohio at Toledo.
No. 3:09-cr-182-1—David A. Katz, District Judge.

Argued: March 1, 2012

Decided and Filed: August 31, 2012

Before: SILER, ROGERS, and WHITE, Circuit Judges.

—————————————

## COUNSEL

**ARGUED:** Spiros P. Cocoves, Toledo, Ohio, for Appellant. Angela M. Miller, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** Spiros P. Cocoves, Toledo, Ohio, for Appellant. Angela M. Miller, Jessica Dunsay Silver, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., Roger S. Bamberger, UNITED STATES ATTORNEY'S OFFICE, Cleveland, Ohio, for Appellee.

—————————————

## OPINION

—————————————

SILER, Circuit Judge. John Gray was found guilty of depriving the rights of Carlton Benton under color of law in violation of 18 U.S.C. § 242, and of falsifying documents in violation of 18 U.S.C. § 1519. Gray appeals this decision on the grounds of inadequate jury instructions, inappropriately applied sentencing enhancements, and

insufficient evidence to establish a violation of 18 U.S.C. § 242.  For the reasons that follow, the decision of the district court is **AFFIRMED**.

**I.**

Gray worked for the Lucas County Sheriff's Office ("LCSO") in 2004 when Benton, a pre-trial detainee in the custody of LCSO, was hospitalized as a result of an episode of seizures.  On May 30, 2004, the hospital discharged Benton, and LCSO officers returned Benton to the jail.  Benton aggressively resisted these officers.  After a struggle, the officers were able to put Benton in double handcuffs, leg shackles, and a belly chain.  Benton returned to jail still in these restraints.  Gray and five other officers escorted Benton to the jail's Medical Unit.

When they reached Benton's cell in the Medical Unit, Benton was supposed to be placed on a bed and have his restraints removed.  However, when the officers attempted to remove the restraints, Benton resisted and threatened to fight the officers once the restraints were removed.  While Benton was still restrained, Gray moved to the head of the bed and placed Benton in a carotid restraint or a "sleeper hold."[1]  Benton lost consciousness.  Gray ordered the remaining officers to remove Benton's restraints. Officer Mangold heard Benton's choking sounds and told Gray to stop, but Gray did not let go.  After the restraints were removed, Gray ordered the other officers to leave.  The other officers noted that Benton was lying silent and motionless on the bed when they left.  Despite the LCSO requirement that correctional officers are to seek medical attention any time force is used or an inmate is injured, Gray did not inform any medical personnel about the events that occurred that day.  Gray admitted in a subsequent interview that he heard Benton's gurgling sounds and knew he should have told a nurse about the situation.

Approximately ten minutes later, a deputy, who was doing rounds, entered Benton's cell and discovered that Benton was neither conscious nor breathing.  Despite

---

[1]A "sleeper hold" occurs when a person wraps his forearm around the victim's neck with the center of the victim's neck in the crook of the person's arm.  When performed correctly, the hold should cause the victim to temporarily lose consciousness.

the best efforts of the deputies and the paramedics, Benton was declared brain dead and removed from life support on June 1, 2004.

All officers who escorted Benton to the Medical Unit were asked to write reports that would be given to the sheriff. Gray wrote two such reports, a Critical Incident Report ("CIR") and a Shift Commander's and Floor Supervisor Report ("SCFSR"). Neither mentioned the restraint hold or that Benton went unconscious as a result of the hold. All of the reports about Benton were provided to the Lucas County Coroner on June 2, 2004 for use in conducting an autopsy. From his training, Gray knew that the hold he used does not leave marks that would have been detected by the autopsy. Following the fabricated reports, Gray lied to an Internal Affairs investigation about applying pressure to Benton's neck. Based on the information available at the time, the coroner pronounced Benton's death a result of natural causes.

Pursuant to the LCSO's Physical Force Policy, officers are required to write reports which thoroughly document the use of force against an inmate. When an inmate dies, the coroner is typically provided with any incident reports regarding the death. The corrections administrator for LCSO recognized that, prior to releasing these documents, he had to check with the sheriff because he is in a fiduciary position and the coroner is an outside agency.

The coroner's verdict deprived the Lucas County Prosecutor of the opportunity to present a homicide case to the grand jury. Similarly, the public record deprived the United States Justice Department of the ability to properly investigate federal charges until 2008. The external investigation into these events began in 2008 due to statements by an LCSO correctional officer made at a disciplinary hearing. The officer stated, in a way that prompted suspicions about the Benton incident, that "people could be killed and no one lose their job." The results of the investigation were turned over to the Lucas County Prosecutor who, out of concern for conflict of interest, submitted them to the U.S. Attorney's office.

Special Agent Brian Russ of the FBI was assigned to the case and began his investigation by using a grand jury subpoena to get access to the LCSO materials related

to the case. Agent Russ initially tried to visit Gray at home to conduct an interview. However, after this attempt failed, Agent Russ was able to interview Gray in July 2008. In that interview, Gray specifically denied using a sleeper hold on Benton and rendering him unconscious. Gray again denied these actions in an interview in October 2008. It was not until Agent Russ described his investigation and its results that Gray admitted both that he used the sleeper hold and that Benton became unconscious as a result. Agent Russ estimated that he interviewed over 60 witnesses in this case. The coroner changed her verdict about Benton's death to homicide once she received information regarding the sleeper hold.

In 2009, an indictment was returned in the Northern District of Ohio charging Gray with two counts (1 and 2) of civil rights violations under 18 U.S.C. § 242, two counts (4 and 5) of falsifying and making false entries in a document in violation of 18 U.S.C. § 1519, and one count (9) of making false statements to an FBI agent in violation of 18 U.S.C. § 1001. Count 1 is distinguishable from Count 2 because Count 1 charges Gray with assaulting and strangling Benton while acting under color of law, whereas Count 2 charges Gray of acting with deliberate indifference to the serious medical needs of Benton. Both Counts 4 and 5 charge that Gray knowingly falsified and made false entries in a document but apply to the CIR and the SCFSR respectively. The indictment also charged Deputy Sheriff Jay Schmeltz with, among other things, two violations of 18 U.S.C. § 1519. Gray and Schmeltz chose to stand trial together. Gray was found guilty of Counts 2, 4, and 5 and Schmeltz was convicted of one violation of 18 U.S.C. § 1519.

At sentencing, the district court added six levels to a base offense level of 12 for Count 2 because it was committed under color of law. Pursuant to USSG § 3A1.3, the court added two additional levels because the victim was restrained during the offense. These enhancements led to an adjusted offense level of 20 for Count 2. The base offense level for Counts 4 and 5 was 14. Pursuant to USSG § 2J1.2(b)(2), this base level was increased by three because it involved substantial interference with the administration of justice. Pursuant to USSG § 2J1.2(b)(3)(B), the offense level was increased by two

because it involved the selection of any essential or especially probative record, document, or tangible object, to destroy or alter. Counts 4 and 5 had an adjusted offense level of 19. After a multi-count adjustment pursuant to USSG § 3D1.4, the greater adjusted offense level was chosen, and two levels were added to it. This calculation yielded a combined offense level of 22 which, in conjunction with Gray's criminal history, provided a guideline range of 41 to 51 months imprisonment. Due to Gray's history of public service, the district court imposed a below-guidelines sentence of 36 months.

## II.

Gray argues that the district court erred with respect to four separate issues during his trial. First, he contends that the district court should have required the jury to find a nexus between the defendant's conduct and the federal investigation involved in § 1519. Second, he argues that the jury instruction for Counts 4 and 5 required a specific unanimity instruction. Third, he claims that the district court's use of acquitted facts in sentencing was unconstitutional and that several of the sentencing enhancements should not apply to this case. Finally, he believes that the evidence is insufficient to support his conviction under 18 U.S.C. § 242.

### A. Nexus Requirement

We review a district court's decision not to give a requested jury instruction for abuse of discretion. *United States v. Henderson*, 626 F.3d 326, 342 (6th Cir. 2010). Gray contends that it was an error for the district court to refuse his proffered jury instruction which included requiring the jury to find a nexus between his obstruction and the federal investigation in 18 U.S.C. § 1519. The cases on which Gray relies establish that, in the context of other statutes, obstruction of justice requires a nexus between the proscribed conduct and some other set of facts. *See Fowler v. United States*, 131 S. Ct. 2045, 2052 (2011) (finding that under 18 U.S.C. § 1512(a)(1)(C) the government must prove that, had the murder victim been allowed to communicate with law enforcement officials, it is reasonably likely that at least one of those officials

would have been a federal law enforcement official); *Arthur Andersen LLP v. United States*, 544 U.S. 696, 707-08 (2005) (requiring that, in order to violate 18 U.S.C. 1512(b)(2)(A), the defendant must have some official proceeding in contemplation when destroying a document); *United States v. Aguilar*, 515 U.S. 593, 599 (1995) (requiring that the "action taken by the accused must be with an intent to influence judicial or grand jury proceedings"). Thus, Gray argues that a nexus requirement ought to be read into § 1519.

Despite Gray's suggestion to the contrary, 18 U.S.C. § 1519 does not require the Government to prove that he intended to obstruct a federal investigation. Rather, the plain language of the statute only requires the Government to prove that Gray intended to obstruct the investigation of *any* matter that happens to be within the federal government's jurisdiction. 18 U.S.C. § 1519. This plain reading is also consistent with § 1519's legislative history and applicable case law. Indeed, we recently stated:

> Two district courts have applied the nexus requirement to § 1519. We are neither bound by their interpretation, nor do we agree with it. As the government points out, the nexus requirement is derived from the language of other obstruction-of-justice statutes, wording that is not found in § 1519. Congress is not required to use the same structure for all obstruction-of-justice statutes. In addition, the legislative history of § 1519 shows that Congress designed the provision to be more expansive than earlier obstruction of justice statutes by dispensing with some of these collateral requirements. The Senate report that accompanied the Sarbanes-Oxley Act specifically disclaimed a nexus requirement for § 1519.

*United States v. Kernell*, 667 F.3d 746, 754 (6th Cir. 2012) (citations omitted). We made it clear in *Kernell* that § 1519 does not contain the kind of nexus requirement that Gray would have us read into the statute. Therefore, Gray's argument that the district court erred in refusing to give his proposed jury instruction on Counts 4 and 5 is without merit.

**B.  Unanimity Instruction**

Defendant argues that the district court erred in failing to provide the jury with a specific unanimity instruction in regard to Counts 4 and 5.  The district court instructed the jury that

> [y]ou will notice that counts four and five charge defendant John E. Gray with violating Section 1519 in more than one way. You will also notice that counts six and seven charge defendant Jay M. Schmeltz with violating that same statute in more than one way. You must consider each count and each defendant separately, but you are instructed that the government does not have to prove all of these ways for you to return a guilty verdict on these charges.
>
> . . . In order to return a guilty verdict, all 12 of you must agree as to each count and each defendant that at least one way of violating the statute has been proved; however, all of you need not agree the same way has been proved.

Determining whether jury unanimity is appropriate for a particular issue involves two distinct considerations:  (1) must the jury's verdict be unanimous as to the issue presented; and (2) if unanimity is required, must the jury be told of the specific unanimity requirement.  *United States v. Duncan*, 850 F.2d 1104, 1111 (6th Cir. 1988), *rev'd on other grounds, Schad v. Arizona*, 501 U.S. 624 (1991).  The first part of the unanimity issue requires making "a commonsense determination of a subject statute's application and purpose in light of traditional notions of due process and fundamental fairness." *United States v. Sanderson*, 966 F.2d 184, 187-88 (6th Cir. 1992) (citing *Schad*, 501 U.S. at 637 (plurality opinion)).

In *Richardson v. United States*, 526 U.S. 813 (1999), the Supreme Court applied *Schad*'s unanimity analysis to a defendant who was charged with violating the prohibition against engaging in a continuing criminal enterprise ("CCE") stated in 21 U.S.C. § 848(a).  *Id.* at 817.  The question presented was whether the judge should have instructed the jury that they had to unanimously agree as to which three violations constituted the series of violations.  *Id.* at 816.  Because each violation is in and of itself contrary to law, as opposed to conduct or an act that is a method of violating a

law, the Supreme Court concluded that each violation under 18 U.S.C. § 848 had to be proven unanimously.  *Id.* at 818-19.

Because unanimity is not required under the first inquiry in *Duncan*, we will not reach the second prong of the *Duncan* analysis.  In the companion case of *United States v. Schmeltz*, 667 F.3d 685 (6th Cir. 2011), we determined the elements of 18 U.S.C. § 1519.  In that case, we upheld the district court's jury instruction, the same instruction at issue here.  *Id.* at 687.  We held that it is the falsification, not the means by which that falsification is achieved, that is an element of 18 U.S.C. § 1519.  Thus, the jury did not need to be unanimous about the way in which Gray violated § 1519.

## C. Sentencing

Gray makes two types of challenges to his sentence.  He contends that the district court's use of acquitted facts is unconstitutional. Furthermore, he argues that some specific sentencing enhancements should not apply.

### i. Allegedly Unconstitutional Procedure

Gray's constitutional challenge is barred by *United States v. White*, 551 F.3d 381 (6th Cir. 2008) (en banc).  In that case, we explained that "enhancements based on acquitted conduct [which] do not increase a sentence beyond the maximum penalty provided by the United States Code" are constitutional.  *Id.* at 386.

### ii. Application of Sentencing Enhancements

The district court's sentencing determinations are reviewed for reasonableness, using a deferential abuse-of-discretion standard.  *United States v. Martinez*, 588 F.3d 301, 324 (6th Cir. 2009).  Procedural reasonableness requires ensuring that "'the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the [18 U.S.C.] § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence.'"  *Id.* (quoting *Gall v. United States*, 552 U.S. 38, 51 (2007)).

Gray challenges the district court's imposition of sentencing enhancements under USSG §§ 3A1.3, 2J1.2(b)(2), and 2J1.2(b)(3)(B).

### 1. § 3A1.3

Under USSG § 3A1.3, "if a victim was physically restrained in the course of the offense, increase by 2 levels." Count 2 charged that Gray, while "under color of any law, . . . willfully subject[ed] any person in any State, . . . to the deprivation of any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States . . . ." 18 U.S.C. § 242. In particular, Count 2 charged Gray with acting with deliberate indifference to the serious medical needs of Benton.

The cursory manner with which Gray treats this argument indicates that Gray waived it. We have held that "[i]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones." *United States v. Stewart*, 628 F.3d 246, 256 (6th Cir. 2010) (quoting *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir.1997)). Nowhere in his appeal does Gray explain what evidence demonstrates that the facts do not establish the enhancement by a preponderance of the evidence. Nor does he provide any analysis of this claim. Rather, he focuses the rest of his appeal on the jury verdicts, the plausibility of this enhancement applying to 18 U.S.C. § 242, and whether case law from this circuit bars the application of this enhancement.

Even if Gray did not waive this claim, his argument is without merit. While he is correct that Count 2 charged him with acting with deliberate indifference to Benton's medical needs, it is unclear why Gray believes that § 3A1.3 should be inapplicable to this charge. There was evidence at trial that Gray failed to obtain medical care and treatment for Benton right after he restrained Benton, and rendered him unconscious, by using a sleeper hold. In other words, since there was evidence that Gray physically restrained Benton and then left him, without medical care, the district court did not abuse its discretion in applying the § 3A1.3 enhancement.

Finally, Gray misstates our holding in *United States v. Carson*, 560 F.3d 566 (6th Cir. 2009). In that case, we held that "[t]o the extent that the district court thought that the lawfulness of the arrest precluded application of § 3A1.3, it committed legal error." *Id.* at 588. Pursuant to *Carson*, the lawfulness of the restraint does not preclude the application of § 3A1.3. Therefore, even if Gray did not waive this claim, we are not persuaded by Gray's arguments, and we affirm the district court's application of § 3A1.3.

### 2. § 2J1.2(b)(2)

In USSG § 2J1.2(b)(2), "[i]f the offense resulted in substantial interference with the administration of justice, increase by 3 levels." The application note to this section explains that, "'[s]ubstantial interference with the administration of justice' includes a premature or improper termination of a felony investigation; an indictment, verdict, or any judicial determination based upon perjury, false testimony, or other false evidence; or the unnecessary expenditure of substantial governmental or court resources." *Id.* at Application Note 1.

Gray argues that the jury verdicts and our holding in *United States v. Tackett*, 193 F.3d 880 (6th Cir. 1999), demonstrate that § 2J1.2(b)(2) should not apply. He contends that the jury verdicts as to Counts 1, 3, and 9 show that there was not a substantial interference with the administration of justice. The underlying logic of this argument is that, because the acquittals demonstrate that the sleeper hold was not material and that an assault did not occur, the reports' omissions did not substantially interfere with the administration of justice. However, this logic ignores case law, which permits the district court to consider acquitted conduct in sentencing. *White*, 551 F.3d at 385.

Gray also contends that *Tackett*'s requirements, in regards to unnecessary expenditure, cannot be met by the facts of this case. 193 F.3d at 887. In *Tackett*, we addressed the § 2J1.2(b)(2) sentencing enhancement. *Id.* at 884. In particular, we focused on the application note which explains that substantial interference can include "the unnecessary expenditure of substantial governmental resources or court

resources." *Id.* (quoting USSG § 2J1.2, Application Note 1). In considering this section, we determined that "the district court must: (1) identify a particular expenditure of governmental resources (time or money), (2) which but for the defendant's conduct would not have been expended, and (3) was 'substantial' in amount." *Id.* at 887 (citations omitted).

The facts of this case support a finding of substantial interference under *Tackett*. The various courts to address the issue of substantial interference have upheld a broad range of factual situations. *See United States v. Atlantic States Cast Iron Pipe Co.*, 627 F. Supp. 2d 180, 203-04 (D.N.J. 2009) (collecting cases). In this case, Gray's falsification of documents, albeit not standing alone, made the investigation into Benton's death more difficult and delayed Gray's trial for four years. But for a statement in an LCSO disciplinary hearing, Gray's trial might never have happened. Unlike *Tackett*, had Gray truthfully fulfilled his obligation, much of the investigation in this case would have been unnecessary. The false records required federal agents to perform numerous interviews in order to discover the truth. This case is analogous to *Tackett* because in both cases the falsification caused the government to incur additional investigation expenditures and delayed a trial. Thus, these facts support the application of § 2J1.2(b)(2) under *Tackett*'s requirements.

### 3. Prejudice

By affirming the substantial interference enhancement, we render any error with respect to the other § 2J1.2 enhancement harmless because if either of the § 2J1.2 enhancements applies then, pursuant to USSG § 3D1.4(a), Gray's offense level remains 22. Because § 2J1.2(b)(2) applies in this case, any error the district court may have committed in its determination of the § 2J1.2(b)(3)(B) analysis is harmless and therefore, we need not consider arguments regarding this enhancement. *See United States v. Smith*, 395 F. App'x 223, 234 (6th Cir. 2010).

**D.  Sufficiency of the Evidence Supporting the Conviction under 18 U.S.C. § 242**

Gray argues that the district court erred when it denied his motions for judgment of acquittal as to Count 2, which charged a violation of 18 U.S.C. § 242. Recently, we stated that a prison official can be found guilty of violating 18 U.S.C. § 242 "where the official knows of and disregards an excessive risk to inmate health or safety." *United States v. Lanham*, 617 F.3d 873, 885 (6th Cir. 2010)  However, the official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* (internal quotations and citations omitted).

Specifically, Gray challenges whether there are sufficient facts to show he acted with deliberate indifference to Benton's serious medical needs.  This argument fails because the evidence establishes that Gray put Benton into a position requiring medical attention and that Gray acted with indifference toward Benton's injured state. Assuming for the sake of argument that Benton was healthy when he and Gray went into the cell, the situation changed while in Benton's cell.  There, Gray placed Benton into a sleeper hold causing Benton to go limp.  Mangold explained that a correctional officer is required to seek medical attention any time force is used or an inmate is injured.  Mangold heard Benton's choking sounds and told Gray to stop.  Gray admitted in a subsequent interview that he knew he probably should have told the nurse that Benton made gurgling sounds, but he did not.  From these facts, a rational jury could have found beyond a reasonable doubt that Gray knew of and disregarded Benton's serious medical needs.  Therefore, the district court properly denied the motion for judgment of acquittal.

**AFFIRMED**.