RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 23a0188p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

UNITED STATES OF AMERICA,

                    *Plaintiff-Appellee*,

    *v.*

KENNETH JOHNSON (21-3979); GARNELL JAMISON (21-4013),

                    *Defendants-Appellants*.

> Nos. 21-3979/4013

─────────────────

Appeal from the United States District Court for the Northern District of Ohio at Cleveland.
No. 1:21-cr-00123—John R. Adams, District Judge.

Argued: December 7, 2022

Decided and Filed: August 18, 2023

Before: SILER, GILMAN, and NALBANDIAN, Circuit Judges.

─────────────────

## COUNSEL

**ARGUED:** Myron P. Watson, Cleveland, Ohio, for Appellant in 21-3979. David L. Doughten, Cleveland, Ohio, for Appellant in 21-4013. Matthew B. Kall, UNITED STATES ATTORNEY'S OFFICE, Cleveland, Ohio, for Appellee. **ON BRIEF:** Myron P. Watson, Gina A. Kuhlman, Cleveland, Ohio, for Appellant in 21-3979. David L. Doughten, Cleveland, Ohio, for Appellant in 21-4013. Matthew B. Kall, UNITED STATES ATTORNEY'S OFFICE, Cleveland, Ohio, for Appellee.

---

**OPINION**

---

NALBANDIAN, Circuit Judge.  Kenneth Johnson was the councilman in Cleveland's Buckeye-Shaker neighborhood, and Garnell Jamison was his executive assistant.  For years, Johnson used his position to fraudulently claim federal reimbursements for payments he never made.  He also secured employment for his children in federally funded programs, even though they were not legally eligible to work in such positions.  And Johnson deposited their earnings into his own account.  In addition, Johnson fraudulently claimed a series of tax deductions.  He also encouraged and assisted his son Elijah in submitting falsified records for Elijah's grand-jury testimony.  Garnell Jamison assisted Johnson in these crimes.

Johnson and Jamison were tried and convicted on 15 charges.  Both now appeal their convictions and sentences, raising a number of issues.  Because none of them has merit, we affirm.

## I. BACKGROUND

Kenneth Johnson was an institution in Cleveland politics.  A councilman for the Buckeye-Shaker Square neighborhood for 41 years, he held one of the longest tenures as a municipal leader in the country.  But that career ended in 2021 when Johnson, along with his executive assistant and co-conspirator Garnell Jamison, was convicted on 15 charges in this case.  Johnson was sentenced to 72 months in prison and three years of supervised release.  Jamison was sentenced to 60 months' imprisonment and three years of supervised release.

### A.  The Fraud Schemes

The fraud charges against Johnson stemmed from two different fraud schemes: (1) collecting reimbursements from the City of Cleveland ("the City") employee Robert Fitzpatrick, and (2) accessing funds appropriated to a city-development corporation.

1. The Reimbursement Scheme

The City had a program that reimbursed councilmembers up to $1,200 per month for certain expenses associated with the wards they represented. To receive reimbursement, a councilman's actions had to benefit the ward—that is, to serve a "proper public purpose"—and not just the councilman personally.

From 2010 to 2018, Johnson claimed $1,200 in reimbursements every month. This began when Johnson approached Fitzpatrick to perform ward services. Fitzpatrick, who worked for the City in a recreation center, had a long history with both Johnson and Jamison. Johnson had mentored Fitzpatrick as a boy, and Fitzpatrick had even lived with Johnson. Fitzpatrick credited Johnson with his career advancement at the recreation center. Around 2010, Johnson offered Fitzpatrick a job.[1] Fitzpatrick would drive through Johnson's ward each day looking for properties that needed maintenance and report the locations of those properties to Jamison. Fitzpatrick never established what his payment would be but trusted that Johnson and Jamison would pay him.

Fitzpatrick performed these duties for about two months, filling out timesheets to keep track of his hours worked. But he was never paid. Eventually, Fitzpatrick stopped working. But he continued to fill out the timesheets, stating that he had performed ward services for Johnson. A receipt from Johnson's office stated that Fitzpatrick had received a $1,200 payment in cash. But Fitzpatrick testified that he never received the money. Even so, Jamison insisted that Fitzpatrick sign IRS Form 1099s that reported this monthly income. So Fitzpatrick's tax liabilities increased, even though he received no additional income.

Despite not paying Fitzpatrick, Johnson requested and received a $1,200 reimbursement from the City each month, matching the payment that he was supposedly making to Fitzpatrick. The Government alleged that Johnson received about $127,200 in reimbursements through this conduct. The FBI eventually contacted Fitzpatrick about these reimbursements, and Fitzpatrick initially did not testify truthfully. Johnson and Jamison instructed Fitzpatrick at different times

---

[1]There is some conflicting evidence about the exact year in which Johnson offered Fitzpatrick the job. Although at one point he testified that the offer came "around" the "2008 time period," (R. 110, Fitzpatrick Trans., 580), he later said that the conversation was "probably around 2010," (*id.* at 582).

not to speak to the authorities or to falsely tell them that Fitzpatrick was being paid $300 per week.

Based on this scheme, Johnson and Jamison were indicted and convicted on one count of conspiring to commit federal-program theft under 18 U.S.C. § 371 (Count 1) and three counts of federal-program theft under 18 U.S.C. §§ 666(a)(1)(A) and (2) (Counts 6–8).

### 2.  The Buckeye-Shaker Square Development Scheme

The second scheme involved an entity known as the Buckeye Shaker Square Development Corporation ("BSSDC"), which administered services to residents in Johnson's ward under the direction of John Hopkins.  Development corporations, including BSSDC, receive federal block-grant funding from the United States Department of Housing and Urban Development ("HUD").  These grants aim to revitalize low- to moderate-income neighborhoods.

Councilmembers can't just spend these funds however they want.  Restrictions apply.  In particular, councilmembers and their families cannot benefit financially from federal funds.  And councilmembers must use the funds for specified purposes.

Johnson was aware of these restrictions.  Still, he benefited from the federal funds— funds he described as "his money."  (R. 112, Menesse Trans., Page ID 805; R. 112, Montagner-Hull Trans., 923.)  To begin, BSSDC hired several of Johnson's adopted children to work in its programs.  And BSSDC used the federal funds to pay for his sons' employment.  In fact, Johnson's sons, as well as Jamison and Hopkins, were given bonuses even when other employees were not paid at all.  In some cases, BSSDC paid the sons for work they hadn't done. But the benefits of nepotism for Johnson's sons were limited, since he often deposited their paychecks in his personal account.[2]

Johnson also repurposed funds in other ways.  At Johnson's direction, BSSDC gave his son Kevin a house, ostensibly as a reward for housesitting and minor maintenance work.

---

[2]Agent Eyer testified that about $27,356 in payroll checks issued to Kevin Johnson, $8,100 to Kenneth Johnson, Jr., and $1,056 to Michael Rodriguez Cornier (Johnson) were deposited into Councilman Johnson's account, for a total of about $36,500.

BSSDC also reimbursed Fitzpatrick for trips that he made with a youth sports team at the recreation center that he led.

BSSDC's bookkeeper, Joanne Montagner-Hull, informed Johnson that she could not seek reimbursement for Jamison and Johnson's sons through block-grant funds. And when Johnson and Jamison pressured her to seek the reimbursement, she resigned.

The shifting of funds ultimately led BSSDC to ruin. From 2015 to 2018, BSSDC failed to complete the financial audits required to receive federal block-grant funds and began to experience serious financial decline. Even worse, it lost access to all sources of funding.

Based on this scheme, Johnson was indicted and convicted on one count of conspiring to commit federal-program theft under 18 U.S.C. § 371 (Count 2) and three counts of federal-program theft under 18 U.S.C. §§ 666(a)(1)(A) and (2) (Counts 3–5).[3]

## B. Tax Offenses

Johnson and Jamison were also convicted of filing false tax returns, in violation of 26 U.S.C. § 7206(2),[4] as well as of failing to report income. As proof of this failure to report income, the Government pointed to the $1,200 checks that Johnson didn't give Fitzpatrick (but instead deposited in his own account) and the payments made out to his children (but instead deposited in his own account).

Johnson also fraudulently claimed a series of false tax deductions. These included charitable deductions based on donating two cars to the charity "Our Lady of the Wayside."[5] He provided a tax preparer with documents that supported a deduction much higher than the amount

---

[3]Jamison was not indicted or convicted on these counts.

[4]Jamison was convicted for his role in preparing Johnson's tax returns.

[5]Johnson claimed that one car sold for $36,000 and the other sold for $43,134. In fact, they sold for $1,200 and $2,800.

the cars actually sold for.**6**    Employees of the charity later testified that the documents were fabricated.

And that's not all.  Johnson claimed charitable donations to BSSDC based on funds that were loaned to BSSDC by Jamison.  Johnson also claimed charitable deductions for items and services purportedly donated to a recreation center located within his ward.  But strong evidence suggested that no such donations were made.   Next, Johnson claimed deductions for unreimbursed work expenses.  He claimed $14,400 in employee expenses per year from the money that he allegedly paid Fitzpatrick (and that the City had paid Johnson).  And he claimed deductions for office rent and utilities for which he didn't pay.

## C.  Obstruction of Justice

Johnson and Jamison were also convicted on two counts of obstruction of justice: one for tampering with a witness in violation of 18 U.S.C. §§ 1512(b)(1) and (2), and another for falsifying records in a federal investigation in violation of 18 U.S.C. § 1519.  Johnson and Jamison learned in September 2020 that Johnson's son Elijah, the manager and records custodian of the recreation center, had been subpoenaed to testify before a grand jury and to provide documents pertaining to donations.

Because of his own health struggles, Elijah had not kept full records of the recreation center.  Elijah didn't have the records requested by the subpoena, so he contacted Johnson and Jamison for help.  Elijah testified at trial that they prepared a dossier of receipts and documents showing that Johnson made each disputed donation to the recreation center.  Elijah relied on their representations of the donations when signing and backdating receipts.  Prior to his grand jury testimony, Elijah met with Jamison to discuss the documents.  Before the grand jury, Elijah testified that Johnson donated certain items and that the receipts listed the items' values.

City employees challenged this testimony at Johnson's and Jamison's trial.  Cleveland Recreation Commissioner Samuel Gissentaner testified that all recreation-center donations under

---

**6**Until approximately 2004, individuals who donated cars had been allowed to write off the fair market value of the car.  After 2004, the tax laws required the owner to write off the actual sale price of the car.  And the dealership sent all donors a 1098-C form with the car's sale price.

$10,000 required his approval.  He added that any donation over $10,000 required the City Council to pass legislation to be accepted.**7**  Yet he could not recall any instance in which Johnson had made a donation to the recreation center, and no records of such donations existed. Other city employees testified similarly.

### D.  Sentencing

#### 1.  Probation Department Calculations

The Probation Department issued Presentence Reports (PSRs) for each defendant.  The PSRs grouped the charges related to the reimbursement and BSSDC schemes into one category and the tax offenses into another.

In the first category, the PSRs recommended an offense level of 30 for Johnson and 27 for Jamison.  Beginning with a base level of 6, Johnson received enhancements for causing a loss between $550,000 and $1.55 million (+14); being an organizer or leader of a criminal activity involving five or more participants (+4); abusing a position of public trust (+2); using a minor to commit an offense (+2); and obstructing justice (+2).  Jamison also began with a base level of 6 and received enhancements for causing a loss between $550,000 and $1.55 million (+14); being a manager or supervisor of a criminal activity involving five or more participants (+3); abusing a position of public trust (+2); and obstructing justice (+2).

In the second category, the PSRs recommended an offense level of 18 for both defendants.  In both cases, the base offense level was 16, and both defendants received enhancements for obstruction of justice (+2).

The Probation Department listed Johnson's advisory Guidelines range at 97 to 121 months of imprisonment.  Jamison's range was 70 to 87 months.

---

**7**Johnson claimed that several of the donations he made were valued over $10,000, including a piano, a TV camera system, and a hot tub.

2. Objections at Sentencing

Johnson objected to the government's calculation of the total loss caused by his activities, as well as the calculation methodology of the government's tax loss from the reimbursement of his payments to Fitzpatrick. He also challenged the sentencing enhancements for being an organizer or leader of a criminal activity involving five or more participants, for using a minor, and for obstructing justice.[8]

But the district court overruled each of Johnson's objections. The court found that the Probation Department correctly calculated the loss amount and sentencing enhancements. The court also agreed with the Department's calculation of the offense level and found that the Guidelines range was 97 to 120 months.[9] Even so, the court varied downward. It imposed a 72-month term of imprisonment, three years of supervised release, and a $1,500 special assessment.

Jamison objected to his sentencing enhancement for being a manager or supervisor of a criminal activity involving five or more participants, and for the finding that he abused a position of trust. He also argued that the government had insufficient evidence to support his obstruction-of-justice charge. But the district court overruled these objections, agreeing with the Probation Department's calculations. And again, the court departed downward, imposing a sentence of only 60 months' imprisonment, three years of supervised release, and a $1,100 special assessment.

Johnson and Jamison now appeal, alleging evidentiary and sentencing errors. We consider their claims in turn.

---

[8]Because Johnson stipulated that the government's calculation of the other loss totals was correct, the government did not present evidence on any aspect of the loss-calculation methodology except for the reimbursement scheme.

[9]The correct high-end calculation of the Guidelines range was 121 months, but this one-month discrepancy is immaterial to the appeal and is uncontested.

## II. JOHNSON

We start with Johnson. He alleges many errors, which we group into three categories: (1) admissibility of evidence at trial; (2) loss calculations; and (3) imposition of sentencing enhancements.

### A. Evidentiary Rulings

We review a district court's decision to admit evidence, over objection, for abuse of discretion. *United States v. Humphrey*, 279 F.3d 372, 376 (6th Cir. 2002). "The scope of this discretion has been broadly construed, and the trial court's actions are to be sustained 'unless manifestly erroneous.'" *Persian Galleries, Inc. v. Transcon. Ins. Co.*, 38 F.3d 253, 257 (6th Cir. 1994) (quoting *United States v. Bonds*, 12 F.3d 540, 554 (6th Cir. 1993)). An abuse of discretion exists when a district court "relies on clearly erroneous findings of fact, or when it improperly applies the law or uses an[] erroneous legal standard." *Romstadt v. Allstate Ins.*, 59 F.3d 608, 615 (6th Cir. 1995) (citation omitted). And we "leave rulings about admissibility of evidence undisturbed unless we are left with the definite and firm conviction that the district court committed a clear error of judgment in the conclusion it reached." *United States v. Dixon*, 413 F.3d 540, 544 (6th Cir. 2005) (cleaned up).

#### 1. Character Evidence Related to Johnson's Campaign Funds

Johnson argues that the district court improperly admitted "other acts" evidence of his prior misuse of campaign funds during the cross-examination of Johnson and its rebuttal closing argument. He reasons that this evidence violates Federal Rule of Evidence 404(b). But he's wrong.

During direct examination, Johnson testified about why he didn't put his name on a $31,000 donation to BSSDC for which he claimed a tax deduction. When asked why he did not put his name on the donation at the outset, Johnson responded that he did not want the other three development corporations in his ward to find out about it. In Johnson's words, "[i]f you give money to one, all the rest of them are going to want the same thing. And I couldn't afford it. The money that I gave them was my campaign money and my savings." (R. 128, Johnson

Trans., 2002–03)  So on cross-examination, the government questioned Johnson about his use of campaign money.  The government noted that "there [was] no record of that $31,000 being paid from this campaign account in any of the statements[.]"  (*Id.* at 2056)

Defense counsel objected, but the court overruled the objection.  And at the government's request, the court gave the jury a limiting instruction that the questioning "should not be used . . . to interpret that Mr. Johnson has made some type of violation of campaign law."  (*Id.* at 2078–80)

In closing argument, the government told the jury that:

> there was no evidence of a pattern of cash going to Fitzpatrick [or] . . . to the children and no evidence of cash going out in donations, or payment of any other type to these people . . . . Kenneth Johnson told you, oh, I paid that cash donation in campaign funds.  Oh, I said, I have your campaign account right here . . . .  And he tells you, oh, no.  It was the other campaign money.  Not the one in my official campaign account, the one that you can trace.

(R. 129, Closing Argument, 2297)

Under Federal Rule of Evidence 404(b), "[e]vidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character."  Fed. R. Evid. 404(b)(1).  Johnson argues that the government was "on a fishing expedition" for evidence of campaign-finance violations.  (Johnson Br. at 10)  This evidence, he reasons, prejudiced the jury into thinking of him as a corrupt politician who would commit the charged crimes.

But Johnson "opened the door" to this line of questioning when he raised the issue of his campaign funds on direct examination.  *United States v. Segines*, 17 F.3d 847, 856 (6th Cir. 1994) (citation omitted).  Indeed, "[a] defendant's introduction of evidence may render his prior acts relevant for impeachment purposes, thus making admissible what may not have been admissible otherwise under Fed. R. Evid. 404(b)."  *United States v. Clingman*, 521 F. App'x 386, 395 (6th Cir. 2013) (quotation marks and citation omitted).  Johnson claimed that his tax-deductible donation came from campaign money as an explanation for his handling of the disputed funds.  So the government had the right to ask about this explanation.

Further, a party can challenge the credibility of a witness's testimony made on "direct examination through cross-examination under Federal Rule of Evidence 607." *United States v. Ross*, 502 F.3d 521, 529 (6th Cir. 2007). And a prosecutor "may assert that a defendant is lying during [his] closing argument when emphasizing discrepancies between the evidence and that defendant's testimony[,]" though "such comments must reflect reasonable inferences from the evidence adduced at trial." *United States v. Francis*, 170 F.3d 546, 551 (6th Cir. 1999) (citations and quotation marks omitted). So the government had every right to challenge Johnson's credibility on an issue that he raised. It questioned how Johnson funded the $31,000 donation using campaign funds when his own records didn't reflect that. And the district court did not abuse its discretion in letting the government do so.

Even if the prosecution's questioning might have led the jury to draw impermissible inferences, the court addressed this by providing a limiting instruction clarifying that "[n]o one is alleging that [Johnson] misused [his campaign] account or that he violated the law, Ohio campaign law in any fashion with regard to that specific account." (R. 128, Johnson Trans., 2080) This issue was "[n]ot to be considered by [the jury] in any way in deciding the issues in this case." (*Id.* at 2080) "A jury is presumed to heed an instruction," so "a defendant's rights are deemed protected by limiting instructions." *Murray v. Superintendent, Ky. State Penitentiary*, 651 F.2d 451, 453 (6th Cir. 1981) (citing *Spencer v. Texas*, 385 U.S. 554, 561–62 (1967)). The limiting instructions here made clear that the jury could not draw the very inferences to which Johnson now objects. So the district court did not abuse its discretion in allowing the prosecution to inquire into Johnson's statements about his campaign funds.

### 2. Hearsay Evidence of the Buick LeSabres' Value

Johnson next argues that the district court should have admitted two pieces of evidence that would have supported his argument regarding the value of his Buick LeSabres. First, Johnson wanted to admit a statement that he allegedly heard from Buick dealership owner George Qua. Johnson claims he believed at the time that one of his cars would be worth a considerable amount based on Qua telling him that "it was the last vehicle, the last big Buick off the assembly line." (R. 128, Johnson Trans., 1986) Second, Johnson sought to admit photographs taken from various classic-car websites. The photos purported to show the asking

price of classic cars, including a 1975 Buick LeSabre listed at about $20,000.[10]  (*Id.* at 2191) Johnson claimed that he received tax documents from Our Lady of the Wayside stating that his cars sold for substantially more than the amount claimed on the tax documents that Our Lady of the Wayside submitted to the IRS.

Generally, Federal Rule of Evidence 801(c) prohibits parties from admitting out-of-court statements that "prove the truth of the matter asserted in the statement."  Fed. R. Evid. 801(c)(2). So if Johnson offered the statement and photos to show that his Buicks were the last big ones manufactured or to show that his Buicks were worth the prices shown in the photos, those pieces of evidence would be hearsay.  But Johnson says this evidence was not hearsay.  He argues that he offered the evidence to prove his state of mind regarding the cars' value, not their true value. And he asserts that by excluding the evidence, the court left the jury with the impression that he knowingly and fraudulently heightened the cars' value in the tax documents that he created.

Johnson's argument with respect to the photographic exhibits is unavailing.  The fundamental problem with these exhibits is that Johnson failed to lay any foundation for their reliability.  As the government argues, the proffered exhibits had many relevancy and reliability issues.  At a minimum, the estimates in the photos were dated June 2021, more than four years after Johnson claimed the deductions.  There was no way of knowing if these exhibits accurately reflected estimates when Johnson claimed his deductions.  Since Johnson did nothing to establish the reliability of the photographs, the court properly excluded them.  *See United States v. Brika*, 416 F.3d 514, 529 (6th Cir. 2005) ("The judge was correct in denying admission of this document, under any rule of evidence, because the proponent of the document did not lay a foundation for it.").

On the other hand, Johnson is correct that the district court erred in excluding George Qua's statement.  We review de novo a district court's determination that certain evidence

---

[10]The descriptions under the images included unsubstantiated price quotes and advertisement-style descriptions.  (R. 209-1, Exhibits, PageID 7181, 7196, 7198) ("This Skylark looks like it just rolled of [sic] the showroom floor in 72"; "Holy Grail of Buick Muscle Cars"; "Wow! Really nice 1975 Buick LeSabre Custom Convertible.  Last of the Buick big convertibles.").  With that in mind, the court excluded the pictures.  The court had "grave doubts about [their] authenticity" and found "there [had] been no foundation laid for them."  (R. 128, Trial Trans., 2113)

constitutes hearsay. *United States v. Young*, 553 F.3d 1035, 1045 (6th Cir. 2009). But we "review evidentiary decisions such as exclusion of hearsay for abuse of discretion." *United States v. Jacob*, 377 F.3d 573, 580 (6th Cir. 2007) (citation omitted).[11] Johnson testified that he used one of his Buicks "sparingly" because he "knew it was going to be worth a lot of money." (R. 128, Johnson Trans., 1986) And when Johnson's counsel asked him for the basis of his belief, he cited his conversation with Qua. The court excluded this evidence as hearsay. But we agree with Johnson that Qua's statement was offered not to show that the car was *actually* "the last big Buick off the assembly line," (*id.*), or even that it was in fact worth the amount Johnson claimed. Instead, it was offered to establish the basis for Johnson's belief about the value of his car. *See, e.g.*, *United States v. Scully*, 877 F.3d 464, 474 (2d Cir. 2017); *United States v. Kohan*, 806 F.2d 18, 21 (2d Cir. 1986); *United States v. Baird*, 29 F.3d 647, 653 (D.C. Cir. 1994). The court should have admitted this statement with a limiting instruction to the jury regarding its proper scope.

Although the court's decision to exclude the Qua statement was erroneous, the error was harmless. *See United States v. Price,* 134 F.3d 340, 349 (6th Cir. 1998) ("A trial court's error is harmless only if this Court is convinced that the error did not influence the jury or had a very slight effect, and can say so with fair assurance." (citation and quotation marks omitted)).

Johnson testified to his subjective interpretation of the value of his car and his belief that Our Lady of the Wayside provided him with inaccurate tax documents, which he claims was the purpose of introducing the hearsay testimony. Yet the government provided significant evidence to refute this, including the testimony of two Our Lady of the Wayside employees who described their tax reporting practices and explained why the documents submitted by Johnson were not legitimate. Viewing the evidence as a whole, the court's decision to exclude this evidence had at most a minimal effect on the jury's decision.

---

[11]We have held that "[w]hen a trial court refuses to admit evidence on hearsay grounds, counsel must explain whether a hearsay exception applies . . . in order to preserve the issue for appeal." *United States v. Arnold*, 486 F.3d 177, 193 (6th Cir. 2007). Otherwise, plain error applies. *Id.* Since Johnson did not make any argument at trial that the Qua statement was not hearsay, arguably plain error should apply here. The government, however, does not make this argument, but instead argues that the court "properly exercised its discretion." (Gov't Br. at 41) Ultimately, it does not matter because Johnson cannot prevail under either standard.

### 3. Opinion Witness Testimony and Jury Instruction

Johnson argues that the district court abused its discretion by allowing the government to ask its own witness on redirect (1) whether he knew that Johnson allegedly committed acts of impropriety, and (2) whether knowing such information would change his opinion of Johnson. The government called Commissioner of Recreation Samuel Gissentaner to testify about the city's policies for accepting recreation donations and the fact that Johnson had made no such donations. Gissentaner was not a character witness.

But on cross-examination, Johnson's attorney asked whether Gissentaner found Johnson "to be honest and truthful." (R. 117, Gissentaner Trans., 1163) Gissentaner said that he did. Johnson's attorney then asked whether Gissentaner had "a personal opinion as to [] Johnson's [reputation][12] for truthfulness and honesty." (*Id.* at 1164) And Gissentaner responded that Johnson had a reputation for being "[v]ery truthful." (*Id.* at 1164)

On redirect, the government asked Gissentaner if his "opinion [would] be impacted if [Gissentaner] knew that Mr. Johnson signed checks issued to his sons that they had not endorsed to [Johnson]." (*Id.* at 1166) Over Johnson's objections, Gissentaner stated that he "would really really have to scrutinize that." (*Id.* at 1166–67) The government then asked if it would change Gissentaner's opinion if he "knew that [] Johnson wrote council member expense reimbursement reports." (*Id.* at 1167) Again over Johnson's objections, Gissentaner stated that he "would have to scrutinize that," but that he "would have to delve into it a little deeper before [he] changed [his] opinion of how [he] fe[lt] about [Johnson]." (*Id.* at 1167, 1168)

Johnson argues that the questions on redirect violated Federal Rules of Evidence 404(a), 405, and 608. They didn't. And Johnson's argument conflicts with the plain text of the rules.

Under Rule 404(a),"[e]vidence of a person's character or character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait." Fed. R. Evid. 404(a)(1). But "[o]n cross-examination of the character witness, the court may allow an inquiry into relevant specific instances of the person's conduct." Fed. R. Evid. 405(a).

---

[12]Johnson's attorney used the word "representation" here. Based on context, it seems he intended to say "reputation."

Johnson questions whether the government could "cross-examine" its own witness on redirect with specific instances of Johnson's conduct without a court finding that the witness was adverse. It could. For purposes of the testimony about Johnson's character, the district court appropriately treated Gissentaner as effectively Johnson's witness.[13] *See e.g.*, *Virgin Islands v. Roldan*, 612 F.2d 775, 778 (3d Cir. 1979) (finding that where the defense questioned the government's witness about the defendant's good character, "it was permissible for the Government to put in evidence of [the defendant's] bad character through impeachment of [the witness's] good character assessment"); *United States v. Powell*, 124 F.3d 655, 661 n.4 (5th Cir. 1997) ("Since [the defendant] raised the issue of his own character by asking [the witness] to testify about [the defendant's] reputation [on cross-examination], it was appropriate for the government to inquire about specific instances of conduct.").

Because Johnson's attorney introduced Gissentaner's personal opinion of Johnson for the first time on cross-examination, the government had the opportunity to respond to this evidence. *See Roldan*, 612 F.2d at 778 n.2 ("For the purpose of rebuttal of this evidence, therefore, the Government's redirect examination was the functional equivalent of the 'cross-examination' referred to in rule 405(a)."); *see also Hickson Corp. v. Norfolk S. Ry.*, 124 F. App'x 336, 343 (6th Cir. 2005) ("Under Rule 405, once a party 'opens the door' to reputation or character evidence on direct examination, inquiry is allowed into 'relevant specific instances of conduct' that rebut or impeach that evidence."). In addition, under Federal Rule of Evidence 607, "[a]ny party, including the party that called the witness" may impeach—that is, "attack the witness's credibility." Fed. R. Evid. 607.[14] So even if Gissentaner was the government's witness on this character evidence, the government could impeach him.

---

[13]Johnson adverts to Rule 608 as well. That rule governs the impeachment of witnesses themselves and is tangential to what Johnson is challenging here. Nevertheless, consistent with Rule 405, under Rule 608(b)(2), a party is permitted to ask a witness about specific instances of conduct that bear on the character for truthfulness or untruthfulness of "another witness whose character the witness being cross-examined has testified about." Here, Johnson himself testified. So Gissentaner's testimony also bore on the character for truthfulness or untruthfulness of "another witness."

[14]Asking a character witness if he is aware of specific acts of misconduct committed by another witness is considered impeachment of the character witness, even though the veracity of that witness is not being attacked. *See, e.g.*, *United States v. Skelton*, 514 F.3d 433, 445 (5th Cir. 2008) ("To be clear, we reiterate that Rule 608(b) permits "did you know" or "have you heard" questions regarding specific instances of conduct of the principal

Johnson also challenges the nature of the government's impeachment, citing Supreme Court precedent that predates the adoption of the Federal Rules of Evidence to argue that "specific acts of misconduct cannot be shown to rebut the positive character evidence for truthfulness and honesty." (Johnson Br. at 25) Yet he incorrectly characterizes the rule. In *Michelson v. United States*, the Supreme Court observed that when a defendant elicits evidence of his good character, the "witness is subject to cross-examination as to the contents and extent of the hearsay on which he bases his conclusions." 335 U.S. 469, 479 (1948). The Court recognized then as the Rules recognize now—parties may test the knowledge of opinion witnesses. *Id.* Indeed, "[a]llowing the government to ask defendants' reputation character witnesses if they had heard of specific acts of conduct was . . . a textbook application of Fed. R. Evid. 405(a)." *United States v. Frost*, 914 F.2d 756, 772 (6th Cir. 1990). Thus, the district court did not abuse its discretion in allowing the government to question Gissentaner's knowledge.

Related to Gissentaner's character evidence, Johnson next challenges the court's jury explanation of the scope of the testimony. Following defense counsel's objections, the court made the following statement:

> Ladies and gentlemen, the Assistant U.S. Attorney is asking questions based upon testimony earlier in the case, allegations which the government is now permitted to ask. The witness has rendered an opinion about the reputation and character of the defendant. The government is permitted to ask questions of the witness as to that opinion. And the government is basing those questions based upon the state of the evidence in this case. So I'm going to allow the questions.

(R. 117, Gissentaner Trans., 1171)

Johnson argues that the statement likely had a prejudicial effect. In particular, he objects to the statement that "the government is basing those questions based upon the state of the evidence in this case." (R. 117, Gissentaner Trans., 1171) He argues that this statement could

---

witness probative of truthfulness or untruthfulness to impeach the credibility of a rebuttal character witness, subject to Rule 403."); *United States v. Krapp*, 815 F.2d 1183, 1186 (8th Cir. 1987) ("This court has previously recognized the possible prejudicial impact of "did you know" type impeachment questions if they have no basis in fact . . . Before an attempt at impeachment of a character witness with "did you know" type questions such as this, the trial judge should have the opportunity, out of the hearing of the jury, to rule on the propriety of the questions."); *United States v. Oshatz*, 912 F.2d 534, 547 (2d Cir. 1990) (Mukasey, J. concurring) ("It bears mention also that in *Lopez v. Smith*, 515 F. Supp. 753, 756 (S.D.N.Y.[ ]1981), Judge Weinfeld wrote that when a character witness testified to opinion, "it was not error to allow the attempt to impeach his opinion" with a guilt-assuming hypothetical question.").

have given the jury the impression that the court believed that the government had proven the allegations in the indictment.

Because Johnson did not object to the district court's statement at trial, we review it for plain error. *United States v. Fraser*, 448 F.3d 833, 841 (6th Cir. 2006). This standard requires us to "decide whether (1) there was an error in the district court, (2) the error was plain, (3) the plain error affected the defendant's substantial rights, and (4) the plain error seriously affected the fairness, integrity or public reputation of judicial proceedings." *Id.* (citing *United States v. Thomas*, 11 F.3d 620, 629–30 (6th Cir. 1993).

Nothing in the record suggests that the district court erred, much less plainly. At no point did the judge pronounce an opinion on the state of the case. Instead, he accurately described the nature of the government's inquiry as probing "allegations" (rather than facts) which were drawn from "testimony earlier in the case." (R. 117, Gissentaner Trans., 1171) In context, the court's reference to the "state of the evidence in the case" was not prejudicial. Instead, it is best read as a reference to the earlier testimony that undergirded the government's questioning.

### 4. The Law Director Letter

Johnson next alleges that the court erred when it did not allow him to introduce a letter written by Cleveland Law Director Barbara Langhenry. The letter discussed the policies on reimbursing BSSDC employees with City funds. It also noted that Langhenry never saw any evidence that would suggest that Johnson used his position to secure a contract that would benefit a family member. The court excluded the letter as hearsay, finding that it "clearly was offered for the truth of the matter as to what Mr. Johnson was told." (R. 128, Trial Trans., 2106) And it added that Johnson couldn't admit the letter unless he "call[ed] the law director . . . [to] testify." (*Id.*)

At trial, Johnson argued that the letter was not hearsay because it was not offered for the truth of the matter asserted but to show that he lacked the intent to commit a crime. We disagree. The letter stated that the City had "not been presented with any evidence 'that [Johnson] used [his] authority or influence to secure a public contract that would benefit a family, a member of [his] family.'" (R. 128, Trial Trans., 2103) Johnson argued that the letter "was an indication that

Councilman Johnson had assurances from the city indicating that he had not misused his position or unduly influenced the process." (*Id*. at 2104)  He also argued that "when the government's attorney asked the question that [he was] acting in violation of what the city had directed to, this letter is directly in contravention of the government's question in that regard." (*Id*.)  But as the government noted at trial, Johnson's argument that he was not submitting the letter for its truth and his claim that it showed that the city had not found any violations in his conduct were at odds.  In order for the letter to contradict the government's claim that Johnson had violated the city's directives, it had to be accepted for its truth.  So the court did not err in excluding the letter as hearsay.

In the alternative, Johnson claims that the letter should have been admitted under Federal Rule of Evidence 803(3) because it went to his state of mind.  He argues that the letter showed that he lacked the knowledge and intent to illegally procure city funds.  In the alternative, he argues that the letter was a business record admissible under Federal Rule of Evidence 803(6).  At trial, Johnson raised the 803(3) exception but not the 803(6) exception.  So while we review the former argument for abuse of discretion, we review the latter for plain error.  *United States v. Chambers*, 441 F.3d 438, 455 (6th Cir. 2006) (citing *United States v. Cowart*, 90 F.3d 154, 157 (6th Cir. 1996)).

Johnson cannot proffer the letter written by *Langhenry* to establish *his* state of mind.  The hearsay exception under Rule 803(3) doesn't apply because Johnson wasn't the declarant making the statements.  Parties can admit hearsay statements if offered to prove "the *declarant's* then-existing state of mind[.]"  Fed. R. Evid. 803(3) (emphasis added).  Here, the declarant was Barbara Langhenry, whose state of mind was not at issue.  *See Calhoun v. Baylor*, 646 F.2d 1158, 1162 (6th Cir. 1981) (finding Rule 803(3) inapplicable to a hearsay statement because the declarant's state of mind was irrelevant); *see also Mutual Life Ins. Co. of N.Y. v. Hillmon*, 145 U.S. 285, 295–96 (1892) (holding that a letter written by the decedent was admissible to show the *author's* intention to travel with the defendant).  No abuse of discretion occurred.

The letter also doesn't fall into the business-record exception under Rule 803(6).**15** In order to admit this evidence, Johnson needed to lay the proper foundation. Fed. R. Evid. 803(6)(D) (requiring parties to show "all the[] conditions" under Rule 803(6) "by the testimony of the custodian or another qualified witness, or by a certification").

But he didn't. Johnson didn't show that Langhenry wrote the letter "at or near the time" when the public contracts benefitted his relatives or that Langhenry even knew about the events. Fed. R. Evid. 803(6)(A). He did not show that the letter "was kept in the course of a regularly conducted activity of" or a "regular practice of" the City. Fed. R. Evid. 803(6)(B)–(C). Nor did he provide a custodian, other qualified witness, or certification that could attest to the required conditions. Fed. R. Evid. 803(6)(D). So the court did not err—much less plainly err—in declining to admit the letter into evidence.

## B. Sentencing Issues

Johnson argues that the district court improperly applied sentencing enhancements related to (1) the calculation of the "total loss" caused by his actions, (2) his leadership, and (3) the use of a minor in his schemes. We consider each challenge in turn.

We review a sentence's procedural reasonableness under the abuse-of-discretion standard. *Gall v. United States*, 552 U.S. 38, 51 (2007). An abuse of discretion occurs if a court commits a "significant procedural error," *id.*, such as the improper "calculation of the advisory sentencing Guidelines[.]" *United States v. Angel*, 576 F.3d 318, 320 (6th Cir. 2009) (citation omitted). When looking at the calculation of the Guidelines range, we review the court's factual findings under the clear-error standard and its legal conclusions de novo. *United States v. Hills*, 27 F.4th 1155, 1193 (6th Cir. 2022).

---

**15**That rule states that a record may be admissible where

(A) the record was made at or near the time by—or from information transmitted by—someone with knowledge; (B) the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit; (C) making the record was a regular practice of that activity; (D) all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification; and (E) the opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness.

Fed. R. Evid. 803(6).

1. Enhancement For Causing Loss

Johnson received a 14-point sentence enhancement for causing a loss between $550,000 and $1.5 million. The Probation Department calculated the total loss as $704,724.12 based on four items: the BSSDC scheme ($479,369.59); the reimbursement scheme ($127,200); the loss of real estate property the defendant had no right to purchase ($85,500); and the loss of two checks that were written to a sports authority out of HUD funds ($12,654.53). The court accepted these findings. At the sentencing hearing, Johnson stipulated that the government's calculation of the loss totals was correct, except as to whether the tax loss from the reimbursement money had been double counted. But he objected to the finding that the losses were attributable to him.

When calculating loss under U.S.S.G. § 2B1.1, the court uses the "greater of actual loss or intended loss." *Id.* § 2B1.1 cmt. 3(A). Actual loss is "reasonably foreseeable pecuniary harm," which is defined as monetary harm that "the defendant knew or, under the circumstances, reasonably should have known, was a potential result of the offense." *Id*. § 2B1.1 cmt. 3(A)(i), (iii), (iv). By contrast, intended loss is "the pecuniary harm that the defendant purposely sought to inflict," including "intended pecuniary harm that would have been impossible or unlikely to occur[.]" *Id*. at cmt. 3(A)(ii); *see also United States v. Wendlandt*, 714 F.3d 388, 393 (6th Cir. 2013).

When a court imposes a sentencing enhancement based on actual loss, the court must determine the reasonably foreseeable pecuniary harm by a preponderance of the evidence because "the court must use the greater of actual or intended loss." *Wendlandt*, 714 F.3d at 393; U.S.S.G. § 2B1.1 cmt. 3(A)(i), (iv). And "the district court need not be exacting." *United States v. Howley*, 707 F.3d 575, 583 (6th Cir. 2013) ("The Guidelines require only a 'reasonable' estimate of actual or intended loss within broad ranges."). The court should then reduce the estimate by "[t]he money returned, and the fair market value of the property returned and the services rendered, by the defendant or other persons acting jointly with the defendant, to the victim before the offense was detected." U.S.S.G. § 2B1.1 cmt. 3(E)(i).

When calculating the Guidelines range for a defendant convicted of fraud, the sentence is enhanced "in proportion to the amount of actual or intended pecuniary loss that resulted from his

offense." *United States v. Igboba*, 964 F.3d 501, 508 (6th Cir. 2020) (citations omitted). And in "determining the amount of loss attributable to a defendant," a court may consider "any relevant conduct." *Id.* at 508 (citations and quotation marks omitted). This includes "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant." U.S.S.G. § 1B1.3(a)(1)(A). In the case of jointly undertaken criminal activity, this also includes the acts and omissions of other individuals, where those acts were

> (i) within the scope of the jointly undertaken criminal activity, (ii) in furtherance of that criminal activity, and (iii) reasonably foreseeable in connection with that criminal activity; that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense[.]

*Id.* § 1B1.3(a)(1)(B).

As relevant here, if an error in calculation would not result in a total less than the threshold for the sentencing increase, we consider the error harmless. *Hills*, 27 F.4th at 1195. For Johnson, that threshold is $550,000. *See id.*

Johnson purports to challenge the loss calculation surrounding the home conveyed to his son. But as briefed on appeal, his argument is conclusory. Because Johnson addresses the enhancement in only a cursory way, he forfeits the argument. *United States v. Gray*, 692 F.3d 514, 521 (6th Cir.2012) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed [forfeited]." (citation omitted)).[16]

### a.  BSSDC Losses

Johnson argues that the district court incorrectly attributed to him $479,369.59 of federal funds used to pay employee salaries. He reasons that Hopkins's testimony proves that Johnson didn't know that block-grant funds ended up in his sons' and Jamison's pockets. At trial, Hopkins testified that he originally paid the sons with funds from non-federal sources. But when BSSDC lost funding, Hopkins began to pay them with money from the sale of residential

---

[16]Similarly, Johnson forfeits his argument against the two-point sentencing enhancement for obstruction of justice because his argument on appeal is conclusory. *Gray*, 692 F.3d at 521.

properties. And Johnson testified that he requested for his sons to not be paid with federal money and that he believed they were being paid with unrestricted funds.

Despite Hopkins's and Johnson's testimony, sufficient evidence supported the district court's finding that Johnson knew that BSSDC improperly used block-grant funds to pay employee salaries. The issue was discussed at several meetings. BSSDC accountant Joanne Montagner-Hull testified that Johnson pressured her to prepare the organization's books so that "everybody . . . was getting paid that . . . had been put on . . . the community development block grant draws before." (R. 112, Montagner-Hull Trans., 924) This testimony supported a finding that Johnson "aided, abetted, counseled, commanded, induced, procured, or willfully caused" the misdirection of federal funds. U.S.S.G. § 1B1.3(a)(1)(A). Based on this record, the evidence supported the district court's finding on Johnson's knowledge. So we cannot conclude that the court clearly erred in attributing this loss to Johnson.

Next, Johnson argues that the misuse of federal funds was not foreseeable in the context of his participation in a jointly undertaken criminal activity. U.S.S.G. § 1B1.3(a)(1)(B). But that argument falls short. That's because courts may hold defendants accountable for all losses that occur after they join a scheme. *See United States v. Ramer*, 883 F.3d 659, 687–88 (6th Cir. 2018) (finding no error when a district court reasoned that all losses from the time a defendant joined a scheme contributed to a foreseeable pecuniary harm).

Here, Johnson participated in the scheme to defraud BDSSC from the beginning. So the misappropriations made by his co-conspirator, Hopkins, were reasonably foreseeable and could be attributed to Johnson for sentencing purposes. Thus, we affirm the district court's BSSDC loss calculation of $479,369.59.[17]

---

[17]Since we affirm the district court's loss calculation as to the BSSDC losses and Johnson's argument about the home conveyed to his son are waived, any other losses attributed to Johnson do not affect the court's finding that Johnson was responsible for causing a loss between $550,000 and $1.5 million. So any other errors in loss calculation are harmless. *See Hills*, 27 F.4th at 1195.

### b. Checks to Robert Fitzpatrick

Johnson also argues that two checks paid to Robert Fitzpatrick worth a total of $12,654.53 should not be attributed to Johnson. The relevant checks were issued by community-development corporations to support Cleveland Elite Sports, but were instead used by Fitzpatrick to support his own sports teams. Johnson argues that the government could not show that the checks were paid with HUD funds. He also provides a conclusory statement that the checks were charitable donations that were not repaid by BSSDC.

The checks were discussed at several points in the trial. Although it is true that the government did not directly link the money to HUD funding, the government was not required to trace the misappropriated funds to federal dollars in order to make its case. *See United States v. Valentine*, 63 F.3d 459, 464 (6th Cir. 1995) ("[Section 666] does not require the government to demonstrate the federal character of the stolen property.").**18** Since the government met its burden at trial, the court did not err in considering these checks at sentencing. And any error would be harmless, since we uphold the BSSDC and home losses. *Hills*, 27 F.4th at 1195.

### c. The $31,000 Offset

Johnson next argues that the court erred in failing to give him a $31,000 offset for money he claims to have personally donated to BSSDC. He contends that, under *United States v. Anders*, a defendant can receive an offset in his total loss calculation for money returned to an injured party. 333 F. App'x 950, 955 (6th Cir. 2009).

When a court calculates loss for sentencing, that "[l]oss shall be reduced" by "[t]he money returned, and the fair market value of the property returned and the services rendered, by the defendant or other persons acting jointly with the defendant, to the victim before the offense was detected." U.S.S.G. § 2B1.1 cmt. 3(E)(i). In *Anders*, we found that the district court erred

---

**18**In 18 U.S.C. § 666 cases, the government must prove only that (1) the defendant "was an agent of local government at the time of the offense"; (2) that he "embezzled, stole, fraudulently obtained or willingly converted property worth at least $5,000 which was under the control, care or supervision of the city"; and (3) that "the above elements occurred during a time in which the city and the water department received in excess of $10,000 in any one year from a qualifying federal assistance program." *Valentine*, 63 F.3d at 462 (citations omitted). Johnson stipulated to the first and third provisions. And as discussed, the court did not clearly err in finding that Johnson had stolen at least $5,000.

in overlooking the value of work performed by the defendant's contract company in partial fulfillment of the contract at issue. 333 F. App'x at 955. In that case, there was no dispute about the value of the defendant's services because the victim impact statement estimated the loss caused by the defendant taking into account the defendant's partial performance of the contract. *Id.*

There is considerable dispute here about Johnson's supposed charitable "offsetting." Johnson claimed that he donated the money anonymously through Jamison in order to prevent other development corporations from seeking similar donations. The government presented evidence that the $31,000 was a loan provided by Garnell Jamison, not a charitable donation from Kenneth Johnson. Kathleen Christopher, BSSDC's former finance manager, testified that the money was listed as a short-term loan. Special Agent Dan Eyer testified that he could find neither a record of a charitable donation nor a potential source of funds for it. He did, however, find a record of approximately $31,000 deposited in the BSSDC accounts, which was "recorded as a loan to be paid back to Mr. Garnell Jamison." (R. 122, Eyer Trans., 1542) This was consistent with the receipts identified by Christopher. But it contradicted Johnson's claims to have donated the money.

Johnson argues that the district court did not provide a reasoned basis for not crediting him with the offset. When a defendant "actively disputes a factual portion of the presentence report that might affect his sentence," the court must rule on the matter and "may not merely summarily adopt the factual findings in the presentence report or simply declare that the facts are supported by a preponderance of the evidence." *United States v. Roberts*, 919 F.3d 980, 988 (6th Cir. 2019) (quoting *United States v. White*, 492 F.3d 380, 415 (6th Cir. 2007); Fed. R. Crim. P. 32(i)(3)(B)).

The district court didn't do its own detailed analysis of the loss calculation, but the court found that the Probation Department's calculation regarding the loss was accurate as a whole. Unlike the defendant in *Roberts*, however, Johnson did not challenge the PSR's methodology for calculating any aspect of the total loss other than the government's tax loss. He objected only to its attribution to him. So the district court didn't have to make a separate finding of fact about the calculation of the $31,000. *See United States v. Stovall*, 337 F.3d 570, 573 (6th Cir. 2003)

(holding that the court was not required to make a finding on questions to which defendant had stipulated in a plea agreement).

As for the attribution of the money, the district court discussed the circumstances of the alleged donation, noting the absence of evidence that Johnson had made any donation of his own money to the community. The government presented evidence that the $31,000 was a loan, and Johnson failed to demonstrate otherwise. So the court did not clearly err when it found by a preponderance of the evidence that no offset was warranted. And again, any errors are harmless. *Hills*, 27 F.4th at 1195.

### d.  Double-Counting

Johnson also argues that the court impermissibly double-counted the government's tax loss by considering the reimbursement-scheme money as a loss to both HUD and to the IRS. The money from the reimbursement scheme informed the Probation Department's calculations for Johnson's Federal Program Theft sentencing (Count Group 1) as well as part of the base offense level calculation in his Tax Offense sentencing (Count Group 2). Since Johnson objected to the calculation at sentencing, we review the court's methodology de novo. *See Hills*, 27 F.4th at 1195.

"Double counting occurs when identical conduct is described in two different ways" to merit different adjustments. *United States v. Dobish*, 102 F.3d 760, 762 (6th Cir. 1996) (citation and quotation marks omitted). Johnson cites *United States v. May* to support his argument that the court impermissibly double-counted. *See* 568 F.3d 597, 605 (6th Cir. 2009). In *May*, the district court aggregated losses from a defendant's failure to pay taxes in an individual capacity and in his role as president of a financial institution. 568 F.3d at 604. We held that the money was taxed only once, so the district court couldn't double count the tax loss. *Id*. at 605. But the court recognized that where the government was legitimately entitled to a tax twice, the money could be aggregated. *Id*. at 604–05 (citation omitted).

Such is the case here. The losses represent the harms faced by two distinct victims—HUD and the IRS. And we have recognized that where the victims are different, "the losses are not, in fact, identical." *United States v. Vysniauskas*, 593 F. App'x 518, 526 (6th Cir. 2015); *see*

*also United States v. Powell*, 576 F.3d 482, 497 (7th Cir. 2009) (holding that where two entities suffered distinct losses, the district court properly counted both). The district court did not abuse its discretion in calculating the base offense level of Count Group 2.

And any error in this calculation would be harmless. The final offense level of Count Group 1 was 30. The final offense level of Count Group 2 was 18. Johnson was sentenced to the greater adjusted offense level. So any error in the calculation of Count Group 2 did not affect his final Guidelines range. *See Hills*, 27 F.4th at 1195.

2. Leadership Enhancement

Johnson next objects to a four-level enhancement for his role as a "leader of a criminal activity that involved five or more participants." U.S.S.G § 3B1.1(a). He argues that there were fewer than five participants in the scheme. Probation said that the enhancement applied because Johnson led a criminal conspiracy that included himself, Jamison, Hopkins, Fitzpatrick, and Kevin Johnson. Johnson argues that the court should not have included Kevin (his son) as a participant because Kevin was not criminally responsible for the activity charged.

Johnson's argument fails. A participant "is a person who is criminally responsible for the commission of the offense, but need not have been convicted." U.S.S.G § 3B1.1 cmt. 1. And we have defined "criminally responsible" individuals as "persons who were (i) aware of the criminal objective, and (ii) knowingly offered their assistance." *United States v. Anthony*, 280 F.3d 694, 698 (6th Cir. 2002). In determining whether a person participates in a conspiracy, courts may consider only "conduct which could lead to a criminal conviction resulting in a term of imprisonment." *Id.* (citing *United States v. Shafer*, 199 F.3d 826, 830–31 (6th Cir. 1999)).

We review "the legal conclusion that a person is an organizer or leader" under U.S.S.G. § 3B1.1 using a "deferential" review. *United States v. Washington*, 715 F.3d 975, 983 (6th Cir. 2013) (citation omitted). With this in mind, we defer to the district court's finding that Kevin participated.

Considerable evidence supported this finding. Probation noted that Kevin provided his signed paycheck to Johnson and signed BSSDC time sheets for hours that he had not worked.

Further, $27,356 worth of Kevin's paychecks were deposited into Johnson's account. The government noted that it could have charged Kevin for this behavior even though it didn't.

Because Kevin Johnson knowingly signed false timesheets and knowingly gave Johnson BSSDC money that he had not earned, he qualifies as a participant under U.S.S.G § 3B1.1. The district court did not err.

### 3. Use-of-a-Minor Enhancement

Johnson next challenges the court's two-level increase under U.S.S.G. § 3B1.4 for his use or attempted use of a minor to commit his charged offenses. The Sentencing Guidelines apply the enhancement if the defendant "used or attempted to use" a minor, which "includes directing, commanding, encouraging, intimidating, counseling, training, procuring, recruiting, or soliciting." U.S.S.G. § 3B1.4 & cmt. 1. We have since clarified that a court must find that a defendant "acted affirmatively to involve [a minor] in the [charged crime]." *United States v. Butler*, 207 F.3d 839, 849 (6th Cir. 2000).

That clarification makes this an easy case. Johnson received this enhancement because he insisted that BSSDC keep his minor sons, Kevin and Michael, on the payroll.[19] And Johnson's use of his sons directly caused BSSDC to violate federal regulations. So the enhancement applies.

Johnson makes two responses. Both fail. First, he argues that the government did not show that his sons were complicit in the federal-program theft scheme. But whether they complied with the scheme is of no consequence. We have held that the enhancement applies even when a minor lacks knowledge of the criminal offense. *United States v. Jenkins*, 229 F. App'x 362, 369 (6th Cir. 2005) (reasoning that the minor enhancement "does not impose a knowledge requirement on the minor who is used in the commission of the offense" (citation omitted)).

And the record shows that the sons did comply with Johnson's scheme. The PSR recommended the enhancement because Johnson and Jamison insisted that Hopkins keep

---

[19]Kevin and Michael were minors for at least part of the time that the criminal activity occurred.

Michael and Kevin on BSSDC's payroll "despite the fact they were not performing services and causing the company to be financially burdened." (R. 142, Johnson First PSR, PageID 4472 ¶ 61) And it noted that Kevin could have been charged for his conduct in the offense, since he knowingly signed time sheets claiming to have worked hours that he did not work, but for which he was paid. And he signed his paycheck over to Kenneth Johnson. Multiple checks of both Michael's and Kevin's ended up in Johnson's account.

Second, Johnson argues that Kevin and Michael "independently wanted to work" for the City and BSSDC. (Johnson Br. at 36–37) But whether the sons wanted to work is irrelevant. Therefore, the district court did not err in applying this enhancement.

## III. JAMISON

Jamison alleges three errors, which we group into two categories. He alleges (A) insufficiency of evidence for two counts on which he was convicted; and (B) error in the application of a sentencing enhancement for abusing a position of trust.

## A. Insufficiency of Evidence

We review de novo a challenge based on insufficiency of the evidence. *United States v. Ray*, 803 F.3d 244, 262 (6th Cir. 2015). Yet we have stated that the defendant making such a claim "bears a heavy burden." *United States v. Maliszewski*, 161 F.3d 992, 1005 (6th Cir. 1998). We have a "strong presumption in favor of sustaining a jury conviction." *United States v. Peters*, 15 F.3d 540, 544 (6th Cir. 1994). And "[w]e draw all available inferences and resolve all issues of credibility in favor of the jury's verdict, and it is not necessary for us to exclude every reasonable hypothesis but guilt." *United States v. Avery*, 128 F.3d 966, 971 (6th Cir. 1997). Furthermore, "[c]ircumstantial evidence alone is sufficient to sustain a conviction." *United States v. Blackwell*, 459 F.3d 739, 760 (6th Cir. 2006) (citing *United States v. Spearman*, 186 F.3d 743, 746 (6th Cir. 1999)). We ask whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (alteration in original).

1.  Witness Tampering

Jamison first argues that there was insufficient evidence to establish beyond a reasonable doubt that Jamison tampered with a witness, Elijah Johnson. Jamison asserts that trial testimony shows that he merely provided documents predating the subpoena to Elijah to supplement incomplete records.

Jamison was convicted of witness tampering under 18 U.S.C. § 1512(b)(1) and (2). To prevail, the government needed to show that Jamison "attempted to (1) corruptly persuade (2) a witness in an official federal proceeding (3) with the intent to influence that witness's testimony." *United States v. Burns*, 298 F.3d 523, 540 (6th Cir. 2002). "Urging a witness in an official proceeding, a term encompassing both federal criminal trials and grand jury testimony, to lie is sufficient evidence of witness tampering" to sustain a conviction under § 1512(b)(1). *United States v. LaVictor*, 848 F.3d 428, 458 (6th Cir. 2017) (cleaned up).

Jamison claims that he merely "provid[ed] records to [a] witness who requested them," and that this is not enough to establish witness tampering. (Jamison Br. at 16) True, it is "an affirmative defense, as to which the defendant has the burden of proof by a preponderance of the evidence," that he engaged only in "lawful conduct and that [his] sole intention was to encourage, induce, or cause the other person to testify truthfully." *United States v. Eaton*, 784 F.3d 298, 307 (6th Cir. 2015) (quoting 18 U.S.C. § 1512(e)). But that defense does not apply here.

Instead, circumstantial evidence proved that Jamison tampered with Elijah's testimony. Multiple city employees testified that Johnson never made large donations to the recreation center like those claimed in the records presented to the grand jury. Yet Elijah's updated records, provided by Jamison, collectively supported that Johnson did. The testimony that Elijah's records had inaccurate information, combined with the fact that Jamison provided those records to Elijah for his grand jury testimony, provided strong circumstantial evidence that Jamison engaged in witness tampering. That's enough. *See Blackwell*, 459 F.3d at 760. A rational trier of fact could find that Jamison corruptly persuaded Elijah, as a witness in an official

federal proceeding, with the intent to influence Elijah's grand jury testimony. We will not tamper with the jury's finding.

## 2. Federal Program-Funds Theft

Jamison next challenges the sufficiency of the evidence on the Federal Program-Theft charge. Jamison was convicted under 18 U.S.C. § 666(a)(1)(A) and (2) based on the reimbursement scheme. To convict Jamison under § 666, the government had to show (1) that he "was an agent of local government at the time of the offense"; (2) that he "embezzled, stole, fraudulently obtained or willingly converted property worth at least $5,000 which was under the control, care or supervision of the city"; and (3) that "the above elements occurred during a time in which the city . . . received in excess of $10,000 in any one year from a qualifying federal assistance program." *Valentine*, 63 F.3d at 462 (citing 18 U.S.C. § 666(a)(1)(A) and (b)).

Jamison argues only that there was insufficient evidence as to the second requirement. He argues that the government didn't prove that he stole $5,000 in a twelve-month period because the government did not deduct the hours that Fitzpatrick actually worked from the total amount stolen. According to Jamison, Fitzpatrick's testimony that he was often at the recreation center in the morning, and that he worked many hours, undermines the government's calculation. Jamison acknowledges that Fitzpatrick was not entitled to receive the money and that Fitzpatrick testified that he was never paid. Still, Jamison notes that Fitzpatrick gave the FBI inaccurate information about the timesheets and paid taxes on the income. And Jamison argues that "the exact number of hours Fitzpatrick worked is unknown," and this "cast[s] doubt" on whether the fraud amounted to over $5,000 for each year charged. (Jamison Br. at 24)

But all of Jamison's arguments fall short because his speculation cannot defeat the jury's findings or call into question Fitzpatrick's credibility on appeal. Fitzpatrick testified that the time sheets he signed were inaccurate, that he was never paid for his hours worked, and that he paid taxes on income he had not earned. And the government presented evidence that reimbursement checks for Fitzpatrick's work were issued to Johnson and deposited into Johnson's bank account.

The jury believed the government's version of events based on Fitzpatrick's testimony. And we "resolve all issues of credibility in favor of the jury's verdict." *Avery*, 128 F.3d at 971. Further, although Jamison had every right to question Fitzpatrick's credibility at trial, we cannot do so here. "Sufficiency-of-the-evidence appeals are no place . . . for arguments regarding a government witness's lack of credibility." *United States v. Hernandez*, 227 F.3d 686, 694 (6th Cir. 2000) (citation and quotation marks omitted). Fitzpatrick's testimony, even absent other evidence, would be enough for us to uphold the jury's findings. And with the government's other evidence, the case gets even easier.

And Jamison's logic is flawed. He argues that there was not enough evidence to support a finding that Jamison stole at least $5,000 based on testimony that Fitzpatrick worked extra hours for which he could have been reimbursed. Yet he does not claim that Fitzpatrick was paid for those hours worked. This is the crux of the issue. It is irrelevant whether Fitzpatrick worked extra hours. It matters whether he was *paid* for them. The government presented evidence that Fitzpatrick was not paid, but that Johnson was, with Jamison's help. The jury accepted that, and there was sufficient basis for them to do so. Again, we decline to disturb their finding.

## B. Abuse-of-a-Position-of-Trust Enhancement

Finally, Jamison argues that the district court erred in applying a two-level sentencing enhancement for abusing a position of trust pursuant to U.S.S.G. § 3B1.3. He argues that he lacked the special skills and discretion necessary to apply the enhancement, and that he was, at most, a supervisor.

The Sentencing Guidelines describe a position of trust as being "characterized by professional or managerial discretion." U.S.S.G. § 3B1.3 cmt. 1. Such individuals "ordinarily are subject to significantly less supervision than employees whose responsibilities are primarily non-discretionary in nature." *Id*. And "the position of public or private trust must have contributed in some significant way to facilitating the commission or concealment of the offense." *Id*.

Those who have a position of "public" trust include more than just "elected officials." *White*, 270 F.3d at 372. Others who have "a high degree of trust" to provide a public service and

"substantial discretion" on providing that service also fall into the bucket. *Id.* Thus, our caselaw finds a defendant in a position of trust by looking at two main factors: the defendant's discretion and his relationship to a victim.

First, discretion. We consider a defendant's "level of discretion" as the "decisive factor." *United States v. Tribble*, 206 F.3d 634, 637 (6th Cir. 2000). The discretion should be "substantial and encompass fiduciary-like responsibilities." *Humphrey*, 279 F.3d at 380. We judge discretion according to the nature of the position. In other words, "the inherent nature of the work itself should naturally convey a substantial degree of discretion to the defendant concerning how to properly administer the property of another or otherwise act in their best interest." *Tribble*, 206 F.3d at 637. But not everyone whose job allows them to commit a crime is subject to the enhancement. Nor will "every 'faceless' government bureaucrat" receive the enhancement. *White*, 270 F.3d at 372. We distinguish employees "who administer another's property from those authorized only to handle it but who are lightly supervised . . . . [I]t is the former type that normally warrants the abuse of trust enhancement." *United States v. Brogan*, 238 F.3d 780, 784 (6th Cir. 2001).

Second, we consider a relationship with the victim. To determine whether the enhancement applies, "we focus on the relationship between the defendant and the victim." *United States v. Tatum*, 518 F.3d 369, 373 (6th Cir. 2008); *see also United States v. Moored*, 997 F.2d 139, 145 (6th Cir. 1993) ("[T]he evidence must show that the defendant's position with the victim of the offense significantly facilitated the commission of the offense."). In that sense, a relationship can exist "almost as if by implication," such as when a victim "ced[es] to the other's presumed better judgment some control over their affairs." *Tatum*, 518 F.3d at 373 (citation omitted). As relevant here, we can consider the public a victim of a government employee's crimes for purposes of the enhancement. *See White*, 270 F.3d at 371. And we can infer a "quasi-fiduciary trust relationship" when victims "place[] a high degree of trust in" a defendant to perform a public service. *Id.*

We agree with the district court that Jamison abused a position of public trust. To begin, Jamison had substantial discretion in his role as Johnson's executive assistant. True, the

discretion afforded to executive assistants varies, but Jamison's was considerable.[20] Jamison had the authority to direct Hopkins to pay bonuses to family members and friends of himself and Johnson. He also acted with broad discretion to make loans to BSSDC to allow it to make payroll.

In this sense, Jamison wasn't just "lightly supervised" and "authorized only to handle" the City of Cleveland's property—he actually had the authority to "administer" it. *Brogan*, 238 F.3d at 784. And this distinction "normally warrants the abuse of trust enhancement." *Id.*; *see United States v. Berridge*, 74 F.3d 113, 117 (6th Cir. 1996) (finding a bank executive to be in a position of public trust in part because "[h]e had the authority to write off and grant loans"). So Jamison had a high level of discretion—which again is the "decisive factor" for the enhancement. *Tribble*, 206 F.3d at 637.

Next, Jamison had a trust relationship with a victim in this case: the public. Jamison was given a "high degree of trust" to carry out public affairs as a result of his connection with Johnson. *White*, 270 F.3d at 371. Jamison, after all, was Johnson's right-hand man, seen to act with Johnson's authority. He was the face of Johnson's schemes time and time again, dropping reports off in Johnson's stead, and being directly contacted when Johnson wasn't available. And in his interactions with BSSDC, he was able to direct the organization in the administration of public funds.

Johnson effectively delegated to Jamison his ability to act as a fiduciary for the public and government agencies. In *United States v. White*, we found that a general superintendent at a water district who submitted false reports abused public trust. 270 F.3d at 372. Customers trusted the district to provide clean water and granted the district "substantial discretion." *Id.* The district, in turn, allowed White to operate with minimal oversight. *Id.* We concluded that

---

[20]We note that at least one of our sister circuits has found that the abuse-of-public-trust enhancement can be applied to an unelected city employee on the basis of his de facto position with respect to the public. In *United States v. Fife*, the Seventh Circuit applied the enhancement to a lawyer who served in a consulting role vis-à-vis the mayor's office. 471 F.3d 750, 753 (7th Cir. 2006). The court held that "[d]istrict courts need not be overly formal when determining whether a given position is one of trust; rather, they should look beyond labels, to the nature of the position the defendant is in and the responsibilities entrusted to him." *Id.*

"the quasi-fiduciary trust relationship between the District and its customers should be imputed to White." *Id.* at 373.[21]

The public and government agencies trusted Johnson to act as a responsible fiduciary. And Johnson gave Jamison discretion to administer public funds. So we impute the trust relationship between the public and Johnson to Jamison. The public trusted Jamison to perform a public service, and he violated that trust. Because Jamison had substantial discretion and a relationship to the victims, imputed through Johnson, the enhancement was warranted.

## IV. CONCLUSION

For these reasons, we AFFIRM the district court on all grounds.

---

[21]The Supreme Court has also recognized that the activities an individual carries out in his work may affect his relationship to the public in the related context of federal bribery statutes. In *Dixson v. United States*, the Supreme Court held that officers of a private nonprofit corporation could be considered public officials for purpose of applying the bribery statute because they "possess[ed] some degree of official responsibility for carrying out a federal program or policy," and they "assume[d] some duties of an official nature." 465 U.S. 482, 499–500 (1984). And the Court in that case was particularly convinced by the fact that the defendants had been given "the power to allocate federal fiscal resources for the purpose of achieving congressionally-established goals." *Id*. at 500. Similarly, we find the fact that Jamison was given the power to distribute federal resources to be persuasive in showing that he occupied a position of public trust.